**Annette LOATMAN, on behalf of herself and all others similarly situated, Plaintiff,**

**v.**

**SUMMIT BANK, Defendant.**

**Civil Action No. 95–5258 JBS.**

United States District Court, D. New Jersey.

Aug. 28, 1997.

Carl D. Poplar, Poplar & Eastlack, Turnersville, NJ, Charles N. Riley, Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano, Cherry Hill, NJ and Lisa J. Rodriguez, Trujillo, Rodriguez & Richards, L.L.C., Philadelphia, PA, for Plaintiff.

Anthony Sylvester, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for Defendant.

## *OPINION*

SIMANDLE, District Judge:

This case is a putative class action suit involving a dispute between borrowers and a bank regarding the purchase of so-called "force-placed" insurance coverage. The insurance in question insured the collateral securing the loans extended by the bank to the borrower if the borrower failed to obtain such insurance herself. The creditor, defendant Summit Bank ("Summit"), purchased the insurance and charged the debtors for it, allegedly pursuant to the defendant's contractual rights. One of these debtors was Annette Loatman, the named plaintiff in this case, who received a loan in the amount of $2,678.94 to purchase a camping trailer.

Presently before the court in this case are cross-motions for sanctions. Plaintiff Loatman seeks sanctions against defendant Summit under the inherent power of the court for Summit's officer's improper personal contact with the named plaintiff. The central issues to be resolved are (a) whether the bank acted wrongfully when its senior vice-president contacted the plaintiff-class representative directly, contrary to the demand of class counsel, to offer her a settlement worth more than ten times the value of her monetary claim in exchange for dropping her case, and (b) whether such conduct, if wrongful, was undertaken in bad faith or for oppressive purposes, triggering sanctions within the inherent power of the court.

Defendant, in turn, seeks sanctions against plaintiff's attorneys for, among other alleged improprieties, making misleading statements to defense counsel and the court, invoking the inherent power of the court and also 28 U.S.C. § 1927.

As explained herein, the court will grant in part and deny in part plaintiff's motion for sanctions, and will deny defendant's motion for sanctions.

### *I. Background*

The facts underlying plaintiff's complaint are of tangential relevance to the motions presently before the court. It suffices to note that this is a breach-of-contract, putative class action case in which the named plaintiff herself seeks to recover approximately $1,500 from defendant's predecessor in interest, United Jersey Bank, N.A. (Summit Bank acquired these interests, and "Summit" and "United Jersey Bank" or "UJB" are used interchangeably for present purposes.) Plaintiff Loatman seeks to represent a class consisting of all United Jersey Bank borrowers who have been charged a forced-placement insurance fee pursuant to form loan agreements between UJB and such persons during the six years prior to the filing of this case, allegedly in violation of state law and federal law under the National Bank Act, 12 U.S.C. § 85, and the Depository Institutions Deregulation and Monetary Control Act, 12 U.S.C. § 1831d, *et seq.*

The factual background that pertains specifically to the cross-motions for sanctions begins with the efforts made by counsel to settle this case. Those efforts began in January 1996, three months after plaintiff filed her complaint. The settlement discussions did not prove immediately fruitful, however, and defense counsel became frustrated. Defense counsel, it appears, directed this frustration primarily at counsel for the plaintiff, believing that plaintiff's counsel, contrary to their ethical obligations, would sabotage any early settlement in order to earn greater fees.

Defendant wanted to settle its claims with plaintiff Loatman only, but plaintiff's counsel instructed defense counsel that any settlement had to encompass the claims of the entire putative class. (Df. Br. at 4). Then, at a settlement conference before Magistrate Judge Robert B. Kugler in late-February 1996, defense counsel stated that defendant would like to propose a settlement offer to plaintiff personally, in open court, instead of through plaintiff's attorneys. (Kugler Opinion, dated Aug. 14, 1996). Defendant further

indicated that it would be willing to settle with Ms. Loatman for an amount greater than her expected recovery in this case. (*Id.*). Defendant aimed to extinguish this litigation entirely by enticing the lone class representative into settling her claims. Counsel for plaintiff rebuffed defendant's efforts to present the settlement proposal in open court, explaining that what defense counsel was trying to do was unethical and coercive. (*Id.*). Judge Kugler called a moratorium upon the court-supervised settlement discussions, indicating that no settlement offers could be made without clarification of the ethical responsibilities raised by plaintiff's counsel. In addition to litigation counsel (Anthony Sylvester of the firm Riker, Danzig, Scherer, Hyland and Perretti), Summit Bank was represented by an Assistant General Counsel, Marian B. Copeland, Esquire, who also attended the abortive settlement conference.

On February 29, 1996, plaintiff's counsel wrote a letter to defendant's outside counsel, Mr. Sylvester, warning Mr. Sylvester and his client not to attempt to contact Ms. Loatman directly in lieu of contacting her through her attorneys. The letter stated in unambiguous terms: "Please be advised that all contacts with Mrs. Loatman relating to any subject of this case must be directed to us, and that *she should not be contacted directly by anyone under any circumstance.*" (Letter of Ira Neil Richards, Pl. Supp. Ex. C) (emphasis added). A few days later, on March 5, 1996, Mr. Sylvester responded with the following note to plaintiff's counsel:

> Apparently there was some misunderstanding at last Tuesday's settlement conference. Obviously, I am aware that Ms. Loatman is represented by your firm and, therefore, I would not contact her. However, as you know, clients have the right to directly communicate with each other; *e.g.*, Ms. Loatman could call the Bank directly if she desired.

(Letter of Anthony J. Sylvester, Pl. Supp. Ex. D).

In an ensuing March 1, 1996, letter to Magistrate Judge Kugler, plaintiff's counsel, Lisa J. Rodriguez, protested defendant's apparent efforts to "buy out" Ms. Loatman by offering her a settlement award far in excess of the value of her claim in this litigation.

(Letter of Lisa J. Rodriguez, Pl. Supp. Ex. E, at 2). Ms. Rodriguez informed Judge Kugler and Mr. Sylvester (by copy) that her client, Mrs. Loatman, "has rejected the possibility of settling on anything other than a class basis." *Id.* The letter concluded:

> Because we believe that Defendant's offer to Ms. Loatman represents an attempt to induce a breach of Ms. Loatman's and her attorneys' fiduciary duties to class members, as well as an attempt to place Ms. Loatman and her attorneys in a potential conflict situation with each other, and because Ms. Loatman has rejected settling on an individual basis, we respectfully request that you ... refrain from scheduling any other settlement conferences, unless Defendant is prepared to discuss a class wide settlement.

(*Id.* at 4). Plaintiff's counsel sent a copy of this letter to defense counsel. On March 4, 1996, plaintiff's co-counsel, Charles Riley, sent yet another letter to Judge Kugler and defense counsel Anthony Sylvester emphasizing that plaintiff's counsel had spoken extensively with Ms. Loatman about settlement and that plaintiff had rejected the idea of settling her case on an individual as opposed to a class-wide basis. (Letter of Charles N. Riley, Pl. Supp. Ex. F). Significantly, Mr. Riley reiterated the admonition against the bank contacting Mrs. Loatman directly, as given by his co-counsel, Ira Richards, a few days earlier. Mr. Riley wrote:

> We were also concerned about Mr. Sylvester's comments about having United Jersey Bank contact Ms. Loatman directly. *We also feel that would be improper conduct on his client's part and we have directed him to inform his client not to contact Ms. Loatman under any circumstances.*

*Id.* (emphasis added). Thus, Mr. Sylvester and the bank's house counsel had been told by Judge Kugler that there would be no more settlement discussions until the ethical obligations were researched, and Mr. Richards and Mr. Riley had informed Mr. Sylvester that Mrs. Loatman could not be contacted directly by the bank, and Ms. Rodriguez and Mr. Riley both confirmed to Judge Kugler and Mr. Sylvester the fact that Ms. Loatman

had rejected the concept and offer of an individual settlement and was interested only in classwide settlement efforts in recognition of her fiduciary responsibilities, and those of class counsel, to the uncertified class she represented.

Defense counsel's frustration with the progress of settlement talks led them to file, on May 23, 1996, a motion to appoint special counsel to represent only Ms. Loatman (as opposed to the entire putative class) for purposes of settlement negotiations. In opposition to defendant's motion, Ms. Loatman testified by a declaration that she was not interested in settling individually with the bank, stating: "I will only consider efforts to settle the case on behalf of the whole class. I informed the Court of this position, through my counsel." (Loatman Declaration, dated June 10, 1996). On August 14, 1996, Judge Kugler denied defendant's motion. Judge Kugler explained: "Class counsel has an obligation to discuss every settlement offer with her client, and the defendant has not shown that counsel has failed to fulfill this obligation, nor has the defendant shown that class counsel has engaged in any other specific instances of wrongdoing...." (Kugler Opinion, filed Aug. 14, 1996, at 11–12).

In June 1996, while the motion to appoint special counsel was still pending, Charles A. Maraziti, a Senior Vice President at UJB, now Summit, decided that he would contact Ms. Loatman personally in an attempt to settle this case. Maraziti later testified during his deposition that he believed that a party to litigation was permitted to directly and personally contact another party to the case. He acquired this belief through his years of working as a bank officer, and testified that he did not believe that the fact that this case was brought as a class action had any effect on the propriety of party-to-party contact. (Maraziti dep. at 37–38).

On June 11, 1996, Maraziti met with James J. Kreig, Esq., Summit's in-house counsel, to discuss his plan to contact plaintiff. (*Id.* at 38). Maraziti knew of the then-pending motion to appoint special counsel, but allegedly did not "focus on that" at the time of his meeting with Kreig. (*Id.*). The record does not reveal what advice Kreig gave to Maraziti during their meeting. Summit's outside counsel, Anthony Sylvester, Esq., has stated that he had no advance knowledge that Maraziti planned to contact plaintiff personally. (June 24, 1996, Trans. at 21). The Maraziti–Kreig meeting on June 11 occurred just one day after Annette Loatman signed her declaration opposing the motion to appoint special counsel. It is apparent that Maraziti hatched his plan to take matters into his own hands, notwithstanding his bank's efforts to have a special counsel appointed, after it became clear that Ms. Loatman opposed the appointment of special counsel and would insist upon a class-based settlement.

On June 19, 1996, Maraziti telephoned the Loatman home and spoke to Mr. Loatman. Maraziti had driven from Dayton, New Jersey to Salem, New Jersey with the intent of speaking to plaintiff in person, but he decided instead to contact plaintiff via telephone after hearing a dog bark when he approached the Loatmans' gate. (Pl.Supp.Ex. G). Maraziti and Mr. Loatman spoke about settlement briefly at about 6:10 P.M. (*Id.*). Mr. Loatman explained that his wife was not home, and that Maraziti could call back later. Mr. Maraziti, according to his notes of the conversation said, "I introduced myself and said I wanted to discuss settlement of the CPI [collateral protection insurance] class action law suit." (*Id.*) Upon questioning from Ms. Loatman, Maraziti then advised Mr. Loatman of the terms of the offer that Summit intended to make to Mrs. Loatman. As Maraziti stated in his notes concerning his trip to Salem:

> I said I was prepared to offer $25,000.00 to settle and that I know his attorney would not be happy with me talking directly to him, but I felt it was only fair that they at least hear me out. I also mentioned that in other class action suits handled by their law firm [Chimicles, Jacobsen & Tikellis, the former firm of plaintiff's attorneys Lisa Rodriguez and Ira Richards], the plaintiff only received several hundred dollars.

(Pl.Supp.Ex. G). Maraziti also asked for permission to drop something off in the Loatmans' mailbox, and Mr. Loatman stated that that would be fine. (Maraziti certif.).

The item that Maraziti subsequently dropped off in the Loatmans' mailbox was a

document that listed the amount of money recovered by each plaintiff class member and the amount of money recovered by the class attorneys in a few previous class action suits handled by Ms. Loatman's attorneys. (Maraziti certif. Ex. A; Pl. Supp. Ex. G). Maraziti wanted to show plaintiff that it is the attorneys and not the plaintiffs who "get[ ] rich" in class action suits. (Maraziti dep. at 55). The purpose of this document, and the intent of Maraziti, was to disparage plaintiff's attorneys in the eyes of plaintiff Loatman herself by convincing her that her attorneys do not have her best interests at heart in this case. Maraziti had acquired the document from Jim Kreig, upon Maraziti's request that Kreig provide Maraziti "with information as to the dynamics of a class action suit." (Maraziti dep. at 54). Kreig, in turn, had previously acquired the document as part of a larger mailing from Summit's outside counsel, Mr. Sylvester's firm of Riker, Danzig. (Kreig dep. at 34). According to Maraziti, he never told Kreig that he intended to provide the document to Ms. Loatman. (Maraziti dep. at 56). Kreig was the supervisor of Ms. Copeland, the bank's in-house counsel who had attended the settlement conference before Judge Kugler on February 27, 1996, and who was aware that the bank was not to communicate an individual settlement offer to Ms. Loatman without further court guidance and supervision in light of the ethical issues raised at that conference.

When Mrs. Loatman returned home on the night of June 19, her husband told her of his conversation with Maraziti. Plaintiff then spoke on the telephone with one of her attorneys in this case, Charles N. Riley, Esq. Because of the application of the attorney/client privilege in these circumstances, the record does not reveal the substance of Mrs. Loatman's conversation with Riley, but one can infer from Mrs. Loatman's subsequent conduct that she decided to hear what Mr. Maraziti wanted to say, and to give little or no reaction, and to report Maraziti's statements back to Mr. Riley.

Maraziti called the Loatman residence again that night, at 8:55 P.M., and this time spoke to plaintiff herself. Maraziti and Loatman discussed a possible settlement. Maraziti repeated that Summit would pay Loatman $25,000 if she would drop her case. (Maraziti notes, at Pl. Supp. Ex. G.) Maraziti then increased the bank's offer, proposing that if the $25,000 sum is taxable, the bank "will up the settlement to cover the tax." (*Id.*) Maraziti also repeated the disparagement of plaintiff's class action lawyers. (*Id.*) He didn't stop there, but proceeded to render legal advice, stating:

I also mentioned that if she is concerned that she has any responsibility to the "class" if she settles, it is my understanding that she does not have a responsibility, however, UJB would stand behind her and defend her against any legal action.

(*Id.*) He further advised her that "the next step would be for her to let her attorney know she has reached a settlement with the bank and that they must present the settlement to the court and the court will rule if this is favorable to Mrs. Loatman." (*Id.*) This latter piece of legal advice was also incorrect, since the court's role in reviewing a settlement which dismisses class allegations is to determine whether the dismissal is fair to the interests of the uncertified class, in the sense of not abusing the class action claim to gain personal benefit for the named plaintiff, nor to collude with defendant to harm the absent class members, as discussed further below. Plaintiff gave Maraziti permission to call her again.

On June 20, 1996, plaintiff again spoke with Mr. Riley on the phone and also went to meet with him in person. The record does not reveal what was discussed during these conversations. The record does reveal, however, that on June 20 plaintiff's counsel called the court and requested a hearing regarding a Temporary Restraining Order ("TRO") barring Summit from having any further direct communications with Ms. Loatman. (Pl. Supp.Ex. I). The court set a return date of Monday, June 24 for the TRO, and asked that plaintiff's papers in support of the TRO be filed on Friday, June 21. Plaintiff's counsel then called defendant's outside counsel, Mr. Sylvester, and informed him of what Maraziti had done and of the TRO return date. Apparently Mr. Sylvester did nothing to stop Mr. Maraziti's next visit to Mrs. Loatman's house, which occurred that very evening.

Later, on the night of June 20, Maraziti again drove from Dayton to Salem to meet

with plaintiff. Upon arriving in Salem, he called plaintiff on the telephone every fifteen minutes from 6:00 p.m. to 8:00 p.m., but no one answered and he drove back to Dayton. Maraziti finally reached plaintiff via telephone that night at 9:05 p.m. (Pl.Supp.Ex. G). Ms. Loatman told Mr. Maraziti that she had called her attorney (Mr. Riley) and that any settlement offer must go through her attorneys. (*Id.*) Disregarding Ms. Loatman's own words that any settlement offer must go through her attorney, Mr. Maraziti called back a minute later to see if she was interested in a settlement now. (*Id.*) Maraziti left his conversation with plaintiff with the impression that plaintiff wanted to settle this case.[1] (Maraziti certif. 10; Pl. Supp. Ex. G).

The next day, plaintiff filed her TRO papers seeking to bar Summit from having any further direct communications with plaintiff. Plaintiff argued that Summit's direct contact with plaintiff unduly pressured plaintiff and constituted harassment. Plaintiff's motion papers, however, did not mention the fact that Ms. Loatman had spoken with Mr. Riley about Maraziti's impending phone call before ever talking with Maraziti.[2] The court found that defendant's conduct was improper and tended to "corrode the relationship" between plaintiff and her attorneys. Invoking the authority granted to the court by Fed. R.Civ.P. 23(d)[3], the court granted the TRO. (Oral Opinion, Tr. June 24, 1996, at 45–57, at Pl.Ex. E.) The parties engaged in expedited discovery on the issues raised in the preliminary injunction motion. The court subsequently made the temporary restraints part of a preliminary injunction against the bank,

filed August 16, 1996 after a hearing on that date.

On October 1, 1996, plaintiff moved for sanctions against defendant on the basis of Maraziti's personal contact with plaintiff. Plaintiff's motion for sanctions seeks: 1) all fees and expenses incurred by plaintiff in conjunction with seeking temporary and permanent relief relating to defendant's misconduct; and 2) a $25,000 sum (the settlement amount offered to plaintiff by Maraziti) to be put in escrow by defendant so that plaintiff may apply for that sum should she prevail in this case.[4]

On July 25, 1997, after the court heard oral argument on plaintiff's sanctions motion, defendant filed a cross-motion for monetary sanctions against plaintiff's counsel. Defendant argues in that motion primarily that plaintiff's counsel improperly deceived the court during the TRO hearing and subsequent hearings by failing to inform the court that Ms. Loatman spoke to her attorneys about her impending conversation with Maraziti before speaking with Maraziti. Defendant contends that plaintiff's counsel misled the court by claiming that an emergency existed at the time of the TRO application, when actually counsel had control over the situation and no emergency existed.

### II. Discussion

#### A. Legal Standards

1. *Standards Governing the Imposition of Sanctions Pursuant to the Inherent Authority of the Court*

    In *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S.Ct. 2123, 111 S.Ct. at

---

1. Defendant makes much of the fact that Mr. Maraziti was polite and cordial to Mrs. Loatman and that she seemed "pleased" with the $25,000 settlement offer. Since the bank was offering her personally an amount of money fifteen times greater than her own claim, why wouldn't she be pleased? It is undisputed, however, under any version of the facts, that she never said she would accept this offer. The oppressiveness of which Mrs. Loatman and class counsel complain was not caused by any overt tone of voice, but by the effort to buy a schism between Loatman, her attorneys, and the similarly situated borrowers through improper means.

2. Defendant eventually learned of this fact on July 9, 1996, while deposing plaintiff. (Df. Supp. Br. at 6).

3. Rule 23(d) states in pertinent part: "In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings ....; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action ....; (5) dealing with similar procedural matters."

4. Plaintiff's sanctions motion was temporarily stayed while the parties explored settlement discussions, again under the supervision of Magistrate Judge Kugler, which broke down in June, 1997.

2132–33, 115 L.Ed.2d 27 (1991), the Supreme Court held that federal courts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." This power includes the ability to assess attorney fees where appropriate. *Id.* at 45, 111 S.Ct. at 2133. The Court cautioned, however, that this power should be exercised with restraint and only in narrowly defined circumstances. *Id.* at 44–45, 111 S.Ct. at 2132–33. The Court noted that the " 'American rule' prohibits fee shifting in most cases." *Id.* at 45, 111 S.Ct. at 2133. An award of fees may be proper, however, when:

> a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.... In this regard, if a court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.

*Id.* at 45–46, 111 S.Ct. at 2133 (citations and quotation marks omitted). The decision of whether to impose sanctions under a court's inherent authority is reviewed for an abuse of discretion. *Id.* at 55, 111 S.Ct. at 2138.

The Third Circuit has admonished district courts to exercise with due care their inherent power to sanction. For example, in *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir.1994), the Third Circuit stated that "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent power, and must also ensure that the sanction is tailored to address the harm identified." The court noted that the sanctioning district court should be careful to sanction the appropriate, culpable individual, whether he or she is a litigant or an attorney in the case. *Id.*

In this case, both plaintiff and defendant ask that sanctions be imposed pursuant to this court's inherent authority to sanction. Plaintiff's sanctions motion points to defendant Summit as the "culpable" entity. Defendant's sanction motion, on the other hand, asks the court to impose sanctions against plaintiff's attorneys.

### 2. Standards Governing the Imposition of Sanctions Pursuant to 28 U.S.C. § 1927

Defendant's sanctions motion also invokes 28 U.S.C. § 1927. That statute provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Section 1927 thus allows the assessment of costs and attorney's fees against a lawyer who multiplies proceedings in a case unreasonably and vexatiously. The statute is aimed at intentional attorney misconduct, and "a finding of willful bad faith on the part of the offending lawyer is a prerequisite for imposing attorney's fees under this provision." *Hackman v. Valley Fair*, 932 F.2d 239, 242 (3d Cir.1991) (citing *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir.1986)). The Third Circuit has referred approvingly to the discussion of section 1927 sanctions in *Colucci v. New York Times Co.*, 533 F.Supp. 1011, 1014 (S.D.N.Y.1982), which stated, "To justify the imposition of excess costs of litigation upon an attorney his conduct must be· of an egregious nature, stamped by bad faith that is violative of recognized standard in the conduct of litigation. The section is directed against attorneys who willfully abuse judicial process." *See Hackman*, 932 F.2d at 242.

### B. Analysis

#### 1. Plaintiff's Motion for Sanctions

The parties to this case agree that the central issue in plaintiff's sanctions motion is whether defendant acted with subjective bad faith or oppressive purpose in contacting Ms. Loatman, specifically whether defendant " 'show[ed] bad faith by delaying or disrupting th[is] litigation.' " *Chambers*, 501 U.S. at 46, 111 S.Ct. at 2133 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2573 n. 14, 57 L.Ed.2d 522 (1978)). The court concludes on the basis of this record that defendant, Summit Bank,

indeed acted in bad faith and for an oppressive purpose in this case. It is, of course, relatively rare that a record will contain direct, "smoking gun" evidence of bad faith on the part of a particular individual. Moreover, because this defendant is a commercial entity as opposed to an individual person, the question of bad faith is rendered even more elusive in the present case. A commercial entity necessarily acts, however, through its agents and officers, and is responsible for the conduct of those agents and officers. *See, e.g., Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1306 (7th Cir.1987). The documentary evidence, interrogatories, and deposition testimony in this record lead the court to conclude that this defendant, acting through its agents and officers, acted in bad faith when it improperly contacted Ms. Loatman.

First, the court notes that plaintiff's counsel had specifically and emphatically informed defense counsel that Ms. Loatman "should not be contacted directly by anyone under any circumstance." (Pl.Supp.Ex. C). Nonetheless, a few months later, Charles Maraziti of Summit contacted Loatman, blatantly contravening the directive set forth by Ms. Loatman's attorney. Defense counsel presumably informed his client of the non-communication request by plaintiff, and in any event Maraziti was aware of the difficulties encountered by the bank in trying to achieve an individual settlement with Mrs. Loatman, yet defendant, acting through Maraziti, contacted Loatman nonetheless.

The record reveals, moreover, that Maraziti himself had knowledge of the instruction not to communicate directly with Ms. Loatman. Specifically, Maraziti's own notes from his trip to Salem state that Maraziti told Mr. Loatman that Maraziti "kn[e]w [Ms. Loatman's] attorney would not be happy with [Maraziti] talking directly to [Loatman]." (Pl.Supp.Ex. G). Maraziti nonetheless made the substantial journey to Salem on two successive days to confront plaintiff directly. Maraziti's claim, made during his deposition, that he acted with an innocent state of mind, is undermined by his contemporaneous admission found in his personal notes.

Moreover, even after the court scheduled the TRO hearing and defense counsel had been informed of Maraziti's contact with plaintiff and plaintiff's continued objection to such contact, Maraziti drove back to Salem and again contacted Ms. Loatman. Thus, even after plaintiff had instituted court proceedings against defendant concerning the improper contact, defendant's agent persisted in his attempts to speak with Ms. Loatman personally. These actions by a knowing defendant constitute bad faith attempts to oppress the class representative and to disrupt this litigation. *See Chambers*, 501 U.S. at 46, 111 S.Ct. at 2133–34.[5]

Further evidence of defendant's bad faith is found in conjunction with defendant's motion for appointment of special counsel for settlement purposes, which was still pending at the time Maraziti contacted plaintiff. The fact that defendant brought this motion indicates, as the court stated in a prior oral opinion in this case, that defendant "had, itself, recognized that there must be an orderly process with regard to any communications with the plaintiff, and if there's any question about the adequacy of the plaintiff's representation and any conflict between plaintiff and plaintiff's class counsel, that that matter can best be addressed through the appointment of a special counsel." (June 24, 1996, Trans. at 53–54). Yet, despite the defendant's recognition that contact with Mrs. Loatman was precluded except through plaintiff's attorneys, a few days before the return date of its own motion and notwithstanding the pendency of that motion, defendant boldly engaged in the very contact that plaintiff's attorney had emphatically stated would not be permitted.

These attempts by defendant to contact Ms. Loatman outside of the presence of her attorneys have had the potential for a lethal impact upon the orderly processes of this class action. By intentionally avoiding plaintiff's class counsel and contacting Ms. Loatman personally after plaintiff's counsel had provided instructions to the contrary, defendant could have caused the relationship be-

---

5. Indeed, at the oral argument concerning this sanctions motion, defense counsel continued to assert that defendant had done nothing wrong by contacting plaintiff personally. The court would have been more impressed with defense counsel's presentation if counsel had admitted the self-evident fact that defendant's conduct was regrettable in this class action context.

tween plaintiff and her attorneys to become tense and distrustful. Specifically, defendant's conduct (through Mr. Sylvester and Ms. Copeland before Judge Kugler initially, then through house-counsel's supplying of the disparaging memo to Maraziti concerning plaintiff's counsel, and finally through Maraziti's well-documented conduct toward the Loatmans), implied that plaintiff's attorneys could not be trusted to convey to plaintiff defendant's settlement offer, and further implied to plaintiff directly that plaintiff's interests may not be aligned with those of her attorneys. Defendant tried to induce plaintiff to question the motives of her attorneys and to question whether her attorneys were acting in plaintiff's best interests. The document that Maraziti left for plaintiff, which set forth attorney's fees awarded in prior class action cases involving this plaintiff's attorneys, was intended to disparage plaintiff's counsel and to drive a financial wedge between class counsel and the class representative. Defendant simply had no business interfering with the relationship between plaintiff and her attorneys in this manner, contrary to the expressed will of Ms. Loatman herself and her attorneys.

The fact that defendant offered plaintiff an exorbitant settlement amount worth more than fifteen times the highest expected value of plaintiff's claim in this case further increased the likelihood of defendant driving a wedge between plaintiff and her attorneys. Plaintiff's personal dispute with the bank involved the bank's charge of two years' premiums upon force-placed collateral insurance in the amount of $1,027.00 (Amended Complaint ¶¶ 22–23), plus interest thereon. Maraziti told Ms. Loatman's husband the bank is offering $25,000, and he offered Ms. Loatman herself $25,000 plus the amount necessary to make up for taxes on that amount, plus defense and indemnity if she were sued for breach of duty to the class. As this court has previously stated concerning this subject, "[A] settlement offer to a class representative that appears to be approximately 15 times the value of her individual case seems to be designed to entice her to abandon her role as class representative.... That this enticement occurs outside the presence of counsel can cause the irreparable harm of unfairly undermining her confidence in the

efforts of her attorneys." (June 24, 1996, Trans. at 55). This court will not condone conduct designed to purchase the allegiance of a named class representative. It is remarkable defendant did not succeed in destroying the vital attorney-client relationship. While plaintiff has stated that her relationship with her attorneys remains a strong one, that does not render defendant's conduct and intent in contacting plaintiff any less improper.

Defendant's conduct also was calculated to drive a wedge between Ms. Loatman and the class she seeks to represent. Defendant's conduct could have disrupted the course of this litigation by inducing the class representative to drop her case at a time when plaintiff did not have counsel present to explain defendant's intentions to her. As the Eleventh Circuit has stated: "Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent ... on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misrepresentations could well be irreparable." *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1203 (11th Cir.1985). The fact that the present class is not yet certified does not alleviate these concerns. As the Third Circuit held long ago, "[A] suit brought as a class action should be treated as such for purposes of dismissal or compromise, until there is a full determination that the class action is not proper." *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir.1970). The obvious dangers relating to unsupervised communications with potential class members are magnified when the contact is directed personally to the named class representative, as in this case.

This court recognizes that in many instances, not arising in a class action context, there is nothing improper with one party in a case making personal contact with an opposing party. *See Lewis v. S.S. Baune*, 534 F.2d 1115, 1122 (5th Cir.1976) ("Courts have consistently held that parties have a right to settle or compromise their litigation without the knowledge or consent of their counsel."). Although a party's lawyer is not ethically permitted to personally contact an opposing party that is known to be represented by

counsel, *see Rules of Professional Conduct,* Rule 4.2, that prohibition does not apply to party-to-party contact.

The contact that took place in this case, however, was of a particularly coercive, oppressive and harmful variety. First, the bank's contact was unwanted. Whether Summit was happy with the fact or not, plaintiff's class counsel had conveyed plaintiff's personal wish to *not* be contacted and to participate in settlement discussions only through class counsel. Plaintiff's counsel stated this orally before Judge Kugler at the February, 1996 settlement conference, and they confirmed this in the two letters of February 29, 1996 and March 4, 1996, above. Indeed, Ms. Loatman's own affidavit dated June 10, 1996, confirmed *under oath* her personal wish to have all settlement discussions handled on a class-wide basis through her attorneys. The bank disregarded this explicit prohibition at its peril.

Second, this was not contact between two parties of equal sophistication. Mr. Maraziti is a Senior Vice President. Defendant is a large commercial entity, undoubtedly involved in substantial amounts of litigation, while plaintiff entered this litigation with essentially no knowledge about commercial affairs and legal procedures.[6] Mr. Maraziti essentially *was* the bank, for purposes of this litigation, aided by house counsel James Kreig, because this matter came within his operating authority in Summit Bank. Mr. Maraziti and Mr. Kreig had full knowledge of the ongoing litigation and court-supervised settlement efforts with Ms. Loatman. As an officer, Mr. Maraziti acts on behalf of the defendant and is subject to the same restrictions as the defendant with respect to this litigation.

Third, the $25,000 settlement offer in this case was different from most other settlement offers between parties because this is a putative class action suit, in which the named plaintiff will owe fiduciary obligations to class members and is relied upon to conduct the litigation in a vigorous fashion on behalf of others. *See* Federal Judicial Center, *Manual for Complex Litigation (Third)* § 30.44 (1995). This settlement offer was also out of the ordinary in that it far exceeded the expected value of the plaintiff's claim. The bank thus intended to convey an offer that would be irresistible to Mrs. Loatman, to the detriment of the class members whom she would abandon if she accepted.[7] By offering a fifteen-fold premium to Mrs. Loatman if she would withdraw as class representative, the bank was engaged in the most sinister and manipulative settlement strategy. This is the hallmark of an oppressive litigation strategy.

Fourth, defendant's Senior Vice President, Mr. Maraziti, was counseled in these efforts by the bank's in-house counsel, Mr. Kreig, with whom Maraziti consulted on June 11. It was Kreig who gave Maraziti the information sheet prepared by Riker, Danzig allegedly showing recoveries for class members and for counsel fees in selected cases handled by Ms. Rodriguez's former law firm. The purpose of Maraziti's conduct, in leaving this list with the Loatmans and discussing the information with Mr. and Mrs. Loatman, was to disrupt the relationship between Mrs. Loatman and her attorneys based upon selective and misleading information. This is the very danger that the rule against uncounseled contacts with a class action representative is designed to prevent.

6. At the oral argument on plaintiff's sanctions motion, defense counsel argued that Charles Maraziti himself actually had minimal sophistication concerning the law governing class action suits. The record, however, does not support this assertion. For example, the record reveals that Maraziti had personally settled many cases for defendant and had authority to settle a case on behalf of defendant for up to $100,000. He is a Senior Vice President of one of the state's largest financial institutions. The court concludes that defendant would not have granted such authority to a lower-level bank officer or one that was uninformed concerning legal mat-

ters. Also, Jim Kreig, defendant's in-house counsel, knew Maraziti was planning to contact the Loatmans personally and apparently did nothing to stop it. This is not the case of some uncounseled, lower level bank employee taking renegade action.

7. Ms. Loatman, of course, recognized her duties to putative class members and continuously made her views known, through counsel and through her own affidavit, that she wanted a class-based settlement. Her fidelity to others similarly situated could not be bought for $25,-000.

Fifth, Mr. Maraziti purported to offer self-serving legal advice to Ms. Loatman when she was represented by counsel, and that advice was incorrect, namely, that she had no duty to the class she represents, and that while court approval of the settlement is necessary, the court will determine whether such a settlement is in her best interests. To the contrary, it is well-established that an individual plaintiff will not be permitted to "abuse the suit nominally brought in the absentees' names." *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 785 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). To guard against the prospect that a defendant enters into a collusive settlement with the named class representative, the court, even in a precertification stage, must "inquire into the circumstances of the settlement and make findings as to what claims, if any, are being compromised, whether the absent class members would be prejudiced by the settlement, or whether the settlement was tainted by collusion," as Magistrate Judge Kugler wrote in this case [Letter Op. filed August 14, 1996, at p. 6, citing *Shelton v. Pargo*, 582 F.2d 1298 (4th Cir.1978); *Manual for Complex Litigation (Third)*, [S 30.42] at 238 (1995) ]. The court has the duty of protecting absentee members by review of the proposed settlement to assure overall fairness, adequacy and reasonableness, which may be present if the settlement was "reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." *Manual for Complex Litigation (Third)*, § 30.41 at 240 (footnote omitted). Mr. Maraziti's advice to Ms. Loatman—that she could accept payment to abandon her class representative status behind her counsel's back and subject only to judicial review to assure her interests were served—was as wrong as it was cynical. Rule 23(e), Fed.R.Civ.P., under which class action dismissals and settlements are considered by the court, inherently requires the participation of knowledgeable and experienced class counsel in the negotiating and settlement approval process, *see In re Gener-*

*al Motors Corp. Pick-Up Truck*, 55 F.3d at 785 (holding that a reviewing court must find whether "the negotiations occurred at arm's length" and whether "the proponents of the settlement are experienced in similar litigation," *inter alia*.) The adequacy requirement of Rule 23(a), when applied to a proposed settlement of class claims, must be assured by a determination that class counsel: "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." *Id.* at 801, citing *Malchman v. Davis*, 706 F.2d 426, 433 (2nd Cir.1983), and *Alvarado Partners, L.P. v. Mehta*, 723 F.Supp. 540, 546 (D.Colo.1989). Defendant's strategy—to drive class counsel out of the settlement negotiation arena entirely by extending an offer in this manner—is an unfathomable assault upon the spirit and purpose of Rule 23 which would have rendered approval of any resulting individual settlement impossible under these circumstances. Again, it understates the gravity of defendant's offense to say that the defendant has undermined the orderly processes of this court.

Sixth, defendant even disrupted the orderly processes of this court in which it had participated, namely, the court-supervised settlement negotiations among counsel, the moratorium imposed by Judge Kugler upon further discussion of an individual settlement, and the premise of defendant's own motion for judicial appointment of a special counsel who would be appointed to represent Mrs. Loatman's personal interests in future settlement discussions. Through Mr. Sylvester, defendant continuously had expressed its interest in achieving an individual settlement with Ms. Loatman, as discussed above, disregarding the will of Ms. Loatman herself, while making the false assumption that plaintiff's experienced class counsel would fail to carry out their duty to convey an individual settlement offer to her.[8] The groundwork for Mr. Maraziti's approach to Ms. Loatman was laid in Mr. Sylvester's February 29th letter (positing that a party may contact an-

---

**8.** Counsel for a class "are responsible for communicating an offer to the class representatives and ultimately to the members of the class." *Manual for Complex Litigation (Third), supra*, § 30.43 at 241. All evidence before this court

demonstrates plaintiff's counsel fulfilled this obligation at all times by discussing all settlement negotiations with Ms. Loatman. (Judge Kugler's findings in his Opinion of August 14, 1996, *supra*, are identical and are incorporated herein.)

other represented party to negotiate settlement without notice to counsel). Mr. Kreig knew this would occur, and Mr. Maraziti knew what he did was wrong because he acknowledged, in his statements to plaintiff and in his notes, that he knew Ms. Loatman's attorneys would not approve of his individual efforts. There was, in short, a longstanding premeditation by defendant to destroy the trust between Ms. Loatman and her attorneys, and to rend the solidarity between Ms. Loatman and the putative class she would represent.

All of these factors rendered defendant's contact with plaintiff oppressive, coercive, unfair and disruptive of the proper course of this class action proceeding. We need not consider whether, in another case, the result would be different if Mrs. Loatman sought the contact, or if the amount of the enticement to her was merely equivalent to the amount of her highest possible recovery, or if class counsel had defaulted in their duties to discuss the individual settlement option with her, or if the contact were not achieved through a senior bank officer with the assistance of the bank's house counsel, or if class counsel had not clearly transmitted Mrs. Loatman's desire to entertain only offers of class-based settlement through her chosen attorneys. It is the combination of these factors in this case that leads this court to conclude that, in this extraordinary situation, exercise of the inherent power is so well warranted.

Defendant must have intended the natural and probable consequences of its actions. In this case, the undoubted intent of those actions was to drive a wedge between plaintiff and her attorneys and the putative class members. Moreover, those actions led to months of otherwise unnecessary motion practice and discovery, all of which delayed the proper course of this litigation.

■■■■■ Because defendant has acted for oppressive purposes and therefore " 'show[ed] bad faith by delaying or disrupting th[is] litigation,' " *Chambers*, 501 U.S. at 46, 111 S.Ct. at 2133 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978)), by intentionally engaging in conduct designed to undermine plaintiff's confidence and trust in her attorneys and the necessary roles of class

representative and class counsel, the court will award to plaintiff the costs incurred in responding to defendant's improper conduct. *See Great Rivers Co-op v. Farmland Indus., Inc.*, 59 F.3d 764, 766 (8th Cir.1995) (indicating that district court has power to preclude communications between defendant and putative class representative and to impose appropriate remedial measures if such communication has already taken place). An appropriate sanction must restore respect for the orderly judicial processes and assure that others will not be tempted to employ harassment tactics striking at the heart of the class action process.

Therefore, the burden of costs and fees in addressing defendant's misconduct shall be borne by the defendant. Such costs include reasonable attorney's fees relating to the TRO, the permanent injunction, and the discovery taken in conjunction with those applications, together with transcript costs and other necessary expenses. Plaintiff is also entitled to reasonable attorney's fees relating to preparing plaintiff's motion for sanctions and responding to defendant's cross-motion for sanctions. That motion, too, stemmed from defendant's improper contact, and, as discussed below, the court finds that motion to be without merit. Plaintiff will submit, within ten days of this Opinion and Order, a schedule of the specific fees she seeks to recover from defendant, by affidavit consistent with L. Civ. R. 54.2 (formerly General Rule 46).

■■■■ Plaintiff has also requested that defendant be compelled to place $25,000 in escrow, to be applied for by plaintiff at the conclusion of this litigation in the event that she prevails on the merits. Plaintiff describes this money as an "incentive fee," intended to enable plaintiff to receive the amount she would have received if she had accepted Maraziti's settlement offer. Plaintiff, however, has submitted no case law that suggests that such a fee award would be appropriate in this case. Indeed, the Third Circuit has again recently reminded the trial courts that our inherent powers must be confined to remedies within the traditional "wide range of tools to promote efficiency in [our] courtrooms and to achieve justice in

[our] results." *In re Tutu Wells Contamination Litigation,* 120 F.3d 368, 382–83 (3d Cir.1997), *quoting Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 564 (3d Cir.1985) (en banc).

The court concludes that such an "incentive fee" is unnecessary in this case as either a punitive or remedial measure. The court finds that defendant will be sufficiently deterred from future misconduct in this case through the attorney fee award described above. Also, as revealed by plaintiff's perseverance in the face of defendant's coercive settlement offer, it is apparent that this plaintiff needs no additional "incentives" to litigate this case in an appropriate and aggressive manner. The court will therefore deny plaintiff's sanctions motion only insofar as it requests that defendant place $25,000 in escrow.

### 2. *Defendant's Motion for Sanctions*

Defendant has cross-moved for sanctions to be imposed under the inherent authority of the court or under 28 U.S.C. § 1927. Defendant argues in its motion primarily that plaintiff's counsel improperly deceived the court during the TRO hearing and subsequent hearings by failing to inform the court that Ms. Loatman spoke to her attorneys about her impending conversation with Maraziti before speaking with Maraziti. Defendant contends that plaintiff's counsel thereby misled the court by claiming that an emergency existed at the time of the TRO application, when actually counsel had control over the situation and no emergency existed.[9]

As discussed previously, a motion for sanctions to be imposed pursuant to the inherent authority of the court or pursuant to 28 U.S.C. § 1927 may succeed only if the person to be sanctioned has acted in bad faith. The purpose of section 1927 is to redress "willful bad faith on the part of the offending lawyer." *Hackman v. Valley Fair,* 932 F.2d 239, 242 (3d Cir.1991); *Quiroga v.*

*Hasbro, Inc.,* 934 F.2d 497, 505 (3d Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991). Section 1927 "is concerned only with limiting the abuse of court processes." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 762, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980). The court will deny defendant's cross-motion for sanctions, in part because defendant has not persuaded the court that plaintiff's attorneys have acted unreasonably, let alone in bad faith, in this case.

Defendant is correct that plaintiff's counsel failed to note, when seeking the TRO on June 24, 1996, that Ms. Loatman had been warned by her husband of Maraziti's impending phone call and had consulted her attorney about that call before ever speaking to Maraziti. Ideally, plaintiff's counsel should have informed the court of this information when seeking the TRO and the permanent injunction. However, defendant has presented no evidence that this omission by plaintiff's attorney was intentional or made in bad faith. The court notes in this regard that plaintiff's counsel did not lie to the court or answer in a false manner a question posed by the court. Rather, the omission was probably caused by a rapid unfolding of events caused by defendant's palpable misconduct and a failure of counsel to realize that the court might find plaintiff's June 19 contact with her attorney to be pertinent to the question of how the court should respond to defendant's improper contact with plaintiff. The court will not infer bad faith on the part of counsel without some evidence in addition to the omission itself.[10]

Defendant also claims that plaintiff falsely created the impression at the time of the TRO hearing that an emergency existed. Defendant states that no such emergency existed because plaintiff had talked with her attorneys about speaking with Maraziti before actually having her conversation with

---

**9.** The timing of defendant's sanctions motion is suspect. Defense counsel was aware of all of the facts underlying this cross-motion by July 9, 1996. (*See* Df. Supp. Br. at 6). Yet, defendant did not file this motion until July 25 of 1997. Moreover, defendant did not file the motion until after the court had heard oral argument on plaintiff's sanctions motion and the court had

indicated that it was inclined to grant plaintiff's motion.

**10.** The court does not view the inaccurate timetable in plaintiff's brief in support of her TRO application to be a sufficient basis on which to infer that plaintiff's attorneys have acted in bad faith in this case. (*See* Df. Supp. Ex. C).

him. The court concludes, however, that plaintiffs acted in good faith in bringing the TRO application and implicitly asserting that an emergency existed. Plaintiff's attorneys had instructed defense counsel that there was to be no contact of any kind with plaintiff. Defendant ignored this admonition, as defendant's agent drove to Salem to confront plaintiff personally at her house and on the telephone. If plaintiff's counsel had instructed plaintiff not to speak with Maraziti, that could have enhanced the feelings of distrust between plaintiff and her attorneys that Maraziti's visit had promoted. Thus, from the viewpoint of plaintiff's counsel, an emergency did exist, and the only way to terminate defendant's improper contact with plaintiff was to enlist the aid of the court.

Defendant's counsel has argued that if Mr. Riley had merely called defendant's counsel when his client first told him of Mr. Maraziti's earlier contact with her husband, the problem could have been handled without the necessity of a TRO application because the attorneys would have stopped Maraziti's contacts. This seems highly unlikely. First, defense counsel have continued to argue there is nothing wrong with client-to-client settlement contacts, even when specifically forbidden by plaintiff's counsel's letters and prior oral statements and the expressed desire of plaintiff herself. Counsel had sought for the past four months to engineer just such a settlement scenario unimpeded by plaintiff's counsel as an intermediary. Second, even after plaintiff's counsel called defense counsel on June 20 and told him that

the contacts had occurred and that a temporary restraining order would be sought, defense counsel apparently did nothing to stop Maraziti from speaking again with Mrs. Loatman that very evening.

In support of its sanctions motion, defendant points to the court's statement, made at the August 15, 1996, hearing, that plaintiff's application for a TRO did not present the court with the "typical emergency" situation because plaintiff's counsel had been aware of Maraziti's impending contact with plaintiff. (Df.Supp.Ex. I). This passing observation by the court, however, did not represent a conclusion by the court that the TRO application was inappropriate or made in bad faith. The court noted merely that plaintiff's TRO application was not a "typical" one. (*Id.*). Even if the court had known that plaintiff had spoken with her attorney before talking with Maraziti, it would still have viewed the TRO as an appropriate measure in this case. The court continues to believe that plaintiff filed the TRO application in good faith.[11]

Aside from the question of subjective bad faith, defendant also fails in attempting to demonstrate that plaintiff's counsel unreasonably multiplied the proceedings in this case, *see* 28 U.S.C. § 1927, or that counsel otherwise disrupted this litigation, *see Chambers*, 501 U.S. at 46, 111 S.Ct. at 2133–34. Defendant contends in this regard: "[N]one of these time-consuming and expensive proceedings would have been necessary if plaintiff's counsel had merely advised plaintiff to tell Mr. Maraziti that she did not wish to

---

11. Defendant also mentions other comments made by the court at the August 15 hearing regarding the fact that plaintiff had consulted with her attorneys before speaking to Maraziti. At one point, the court stated, "I agree that [defendant] and I both should have known of that.... [Defendant's attempt to contact plaintiff was] not as much of a renegade action as it appeared to be ... on the very first moment of June 24th." (Pl.Supp.Ex. 1). The court further indicated at that time, however, that the peripheral involvement of plaintiff's counsel did not render defendant's conduct or intentions any less inappropriate: "Now, it's true that the communication was out of [plaintiff's] counsel's presence, and ... it's true that the bank had no idea that counsel for the plaintiff[ ] w[as] involved...." (*Id.*). In addition, in a portion of the court's statement not mentioned by defendant here, the court retracted its comment about defendant's

conduct not being a "renegade" action after plaintiff's counsel reminded the court that Maraziti had provided the $25,000 offer to Mr. Loatman before plaintiff's counsel had become involved. The court stated to plaintiff's counsel:

Oh, you're right. I'm sorry.
. . . .
The offer was first communicated to Mr. Loatman while Mrs. Loatman was still at work, and so she, obviously, couldn't have called counsel before that offer was made. She comes home from work; I assume her husband tells her, here's a call that came, and then she called [her attorney].

(*Id.*). The isolated comments by the court to which defendant cites should not be interpreted as a conclusion by the court that plaintiff's counsel acted with malice or with the intent to disrupt the course of this litigation. The court has reached no such conclusion.

speak to him . . . ." (Df. Supp. Br. at 11). In effect, defendant contends that plaintiff's attorneys should be sanctioned for not doing more to mitigate the damage brought about by defendant's own improper conduct. Defendant's contention is more than a little ironic: defendant had already ignored multiple oral and written admonitions by plaintiff's counsel and plaintiff herself that she wanted no such contact.

It is true that, in theory, plaintiff's attorneys could have asked plaintiff not to speak with Maraziti. As discussed previously, however, such conduct could have enhanced the feelings of distrust between plaintiff and her attorneys that Maraziti's visit was designed to promote. Plaintiff's counsel also had to consider the effect of such a request on defendant's pending motion to appoint special counsel. Plaintiff's counsel apparently feared that "if [counsel] had advised Ms. Loatman not to speak to Defendant, Defendant would use that against Plaintiff's counsel in its pending motion." (Pl. Supp. Br. at 4). Thus, plaintiff's counsel was in an unenviable and difficult situation, all brought about by defendant's improper contact with the Loatmans.

Significantly, moreover, by the time that plaintiff spoke to her attorneys about her impending conversation with Maraziti, the harm brought about by Maraziti's visit to Salem had already occurred. That is, Maraziti had already communicated defendant's $25,000 individual settlement offer to Mr. Loatman by that time without knowledge of plaintiff's attorneys. Obviously, there was nothing that plaintiff's counsel could do to stop Mr. Loatman from relaying that offer to his wife, and Mr. Loatman had probably informed his wife of the offer before she even attempted to reach her attorney. In addition, Maraziti had already dropped off at the Loatman residence the document disparaging plaintiff's attorneys. Thus, despite defendant's complaints regarding the course of conduct adopted by plaintiff's counsel on June 19, 1996, by that time, plaintiff's attorneys could have done little to avoid the consequences brought about by defendant's conduct.

With regard to defendant's claim that plaintiff's attorneys should have responded to Maraziti's conduct without enlisting the aid of the court, this record reveals that nothing short of court intervention would have successfully prevented defendant from continuing to contact Ms. Loatman in June of 1996. As noted, plaintiff's counsel had already told defense counsel that no one was to have any contact of any kind with plaintiff, and that admonition was not heeded. Plaintiff's counsel also informed defense counsel that plaintiff was only interested in settlement offers that addressed the claims of the entire putative class, and that instruction was not heeded. Moreover, even after plaintiff began the process of seeking a TRO and informed defense counsel of what had happened, Maraziti went back and again contacted Ms. Loatman that very night. It is evident that plaintiff was unlikely to forestall further improper settlement efforts by Maraziti without a court order. Once Maraziti determined that he would contact the Loatmans with defendant's settlement offer, the "time-consuming and expensive proceedings" of which defendant refers were inevitable. Therefore, it was the defendant, and not plaintiff's attorneys, who delayed and disrupted the proper course of this litigation.

This section 1927 sanctions cross-motion by defendant is a further extension of defendant's oppressive conduct toward plaintiff and her attorneys. As already noted above, the court has awarded plaintiff her counsel fees expended in defending against this cross-motion, because plaintiff's counsel's efforts continued to be expended in response to the underlying situation of defendant's creation. The present cross-motion is itself another failed harassment tactic by the defendant, designed to impugn plaintiff and her attorneys who had been successful in the prior TRO application and upon the motion for sanctions itself (as indicated by the court at oral argument prior to defendant's decision to file this motion). *See Lukas v. Nasco International, Inc.*, 128 F.R.D. 619, 622–623 (D.N.J.1989). It is unnecessary to decide whether the filing of a non-meritorious motion for section 1927 fees triggers an award to the prevailing party. It suffices to find, as we do, that the efforts of plaintiff's counsel in responding to this cross-motion were necessary to understand and redress the underlying misconduct by defendant, since the facts and law of this cross-motion are intertwined

with plaintiff's sanctions motion. Therefore, as an item of fees recoverable under plaintiff's original sanctions motion, plaintiff may recover for reasonable time and fees of counsel in responding to this cross-motion.

*III. Conclusion*

The court concludes that defendant acted for an oppressive purpose and in bad faith when it improperly contacted plaintiff in an attempt to extract a settlement agreement from her in a manner calculated to undermine the attorney-client relationship and her relationship to absent members of the putative class. In addition, the court finds that defendant's conduct had the effect of disrupting this litigation, causing over a year of motion practice unrelated to the merits of the class action. Thus, pursuant to this court's inherent authority to sanction, the court will order defendant to compensate plaintiff for all fees and costs reasonably expended as a result of defendant's improper conduct. The court, however, declines to order defendant to place $25,000 in escrow as an "incentive fee" to be applied for by plaintiff should she prevail in this litigation.

Defendant's motion for sanctions will be denied. Defendant has not persuaded the court that plaintiff's attorneys acted in bad faith, disrupted this litigation, or vexatiously multiplied these proceedings in responding as they did to defendant's improper contact with Ms. Loatman.