Henderson SCOTT, Plaintiff,

v.

IBM CORPORATION, Defendant.

No. CIV.A. 98–4092 (JBS).

United States District Court,
D. New Jersey.

Sept. 27, 2000.

As Amended Nov. 29, 2000.

Fredric J. Gross, Mount Ephraim, NJ, Paul D. McLemore, Trenton, NJ, for Plaintiff.

Robert J. Feltoon, Deborah J. Krabbendam, Jacquelyn J. Ager, Conrad, O'Brien, Gellman & Rohn PC, Mount Laurel, NJ, for Defendant.

### OPINION

SIMANDLE, District Judge.

In this federal employment discrimination case, plaintiff Henderson Scott brings suit against his former employer, IBM, alleging, *inter alia*, that IBM discriminated against him on the basis of his race, age, and disability in contravention of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act (ADEA), the Americans With Disabilities Act (ADA), 42 U.S.C. § 1981, and the New Jersey Law Against Discrimination (NJLAD) when it terminated

him from employment as part of a company-wide reduction-in-force in 1996. Presently before the Court are the parties' cross-motions for summary judgment pursuant to Rule 56, Fed.R.Civ.P., and plaintiff's motion in limine to exclude certain recently disclosed evidence. As discussed in further detail herein, IBM has conceded that plaintiff has satisfied his burden of stating a prima facie case of race and age-based discrimination under the *McDonnell Douglas* framework, but argues that plaintiff has failed to make out a prima facie case under the ADA.

The main issues for decision in the present cross-motions are (1) whether plaintiff has stated a prima facie case of discrimination under the ADA, (2) whether plaintiff has created a genuine issue as to whether IBM's proffered legitimate reasons for terminating Mr. Henderson were pretextual, and (3) whether, as plaintiff argues, IBM's alleged misconduct during discovery warrants sanctions up to and including striking IBM's proffered defenses to plaintiff's claims.

For reasons now discussed, the Court finds that plaintiff has not stated a valid ADA claim, but has created triable issues as to his ADEA and Title VII claims. The Court also finds that IBM's conduct during discovery does not merit the more severe sanctions plaintiff seeks, but it is suitably addressed by an instruction to the jury regarding the "spoliation inference", a permissible inference that certain documents IBM destroyed would have been harmful to its case. Accordingly, defendant's motion will be granted to the extent that it seeks dismissal of plaintiff's ADA claims, plaintiff's time-barred NJLAD and § 1981 claims, and his superfluous fraud claim,[1] but is otherwise denied. Plaintiff's cross-motion will be denied, as will his motion to strike the defendant's untimely disclosed evidence.

## BACKGROUND

Mr. Scott, a black male, began working for IBM in April 1973, and worked there until his termination in March 1996 at the age of 52. (Compl.¶¶ 3–4.) During his employment at IBM, Mr. Scott worked at various jobs, including customer engineer and customer service representative. (Scott Dep. I at 22, Def. Ex. 1.) From 1983–1996, Mr. Scott worked as a customer engineer, and his primary duty was the installation and maintenance of large mainframe computers. (*Id.* at 34:2–4.)

Mr. Scott was involved in automobile accidents in 1957 and 1967 which left him with a noticeable limp and loss of flexibility in his back. The 1957 accident broke his lower back and caused his "foot drop". (*Id.* at 11–12.) The 1967 accident aggravated his condition, and required two spinal fusion operations, one in 1967, the other around 1970. (*Id.*) Following medical examination at IBM in the mid–to–late–1970s, IBM placed into Mr. Scott's personnel filed a medical notation stating that Scott should not "lift over 35 pounds" or engage in "pushing or pulling motions". (*Id.* at 13–20; Notation, Pl.Ex. H at 1.)

Around 1995, Mr. Scott for the first time complained of discrimination at IBM. This complaint stems from the substance and timing of a written evaluation prepared by Scott's supervisor Bruce Johannessen, a white male, in January 1995. While the overall tone of the evaluation was positive, and stated that "Henderson does a fine job with the traditional [Customer Engineer] job," Johannessen's report recommended that Scott "take a more active role in helping management by providing solutions in addition to providing or identifying job inhibitors." (1995 Evaluation, Def. Ex. 19 at D–57.) The report concluded that Scott's overall performance rating should be graded at level "3" or "contributor", down from level "2" or "high contributor", the rating Scott received the previous year. Curiously, Johannessen delivered the evaluation to Scott while he was on-site at the Sak's Fifth Avenue computer center in New Jersey, one of Scott's major accounts.

Mr. Scott took issue with the timing and substance of the evaluation, and suspected

---

**1.** Plaintiff concedes that his cause of action for fraud is superfluous and it will be dismissed.

(Pl. Br. at 42.)

that his race was a factor in his downgrade. (Scott Dep. I at 123:21–124:1.) In February 1995 Scott contacted Rick Weiss, head of IBM personnel in the New York region to complain about Mr. Johannessen's timing as well as the content of the evaluation. (*Id.* at 129.) Scott told Weiss that he thought it was "totally inappropriate" the way Johannessen gave him the report, and asserted that Johannessen had no facts to justify the evaluation downgrade. (*Id.* at 133.) Weiss suggested that Scott discuss the evaluation with Pamela Biggs, Johannessen's supervisor. (*Id.* at 135.) Soon thereafter, Scott called and later met with Ms. Biggs and aired his concern that Johannessen "had no facts" to justify the overall "3" rating. (*Id.* at 137.) Scott says that he might have mentioned to Biggs that the only justification he could think of was the color of his skin. (*Id.* at 134–37.) After a second conversation, Biggs told Scott that she found the "3" rating to be justified and that it would not be changed. (*Id.* at 146–150.)

Plaintiff again called Weiss after the second conversation with Biggs and learned that Weiss concurred with Biggs. Plaintiff then informed him that he felt the poor evaluation was motivated by racial animus, and that he had been denied a promotional opportunity because of his race.[2] According to Mr. Scott, Weiss responded hotly "that's an inflammatory remark, and if you make it again, I will call your branch office and have the appropriate action taken against you." Scott then asked for the name of Weiss's boss, which plaintiff contends he provided along with the naked threat of "let me give you some friendly advice, think of your career before you do or say anything else." (*Id.* at 151:19–152:12.)

Unhappy with Ms. Biggs's refusal to adjust his overall rating and Weiss's comments, Scott on March 1, 1995 submitted an internal complaint pursuant to IBM's "Speak Up" program, which is intended to allow any employee to raise issues generally applicable to a number of employees. (Speak Up Grievance, Def. Ex. 21.) Mr. Scott's Speak Up complaint referred to his conversations with

Mr. Biggs and Mr. Weiss, and referenced the past promotional opportunity he felt he lost on account of race sensitivities at IBM. As relief, Scott requested to have appropriate action taken, and to have Mr. Scott's grievance heard concerning Johannessen's allegedly unfair evaluation. (*Id.*)

IBM management responded quickly to Scott's Speak Up complaint. A representative of IBM's chairman, Lou Gerstner, called plaintiff to inform him that his concerns would be handled through an IBM program known as "Open Door". The Open Door policy is an internal grievance procedure at IBM under which an employee can raise concerns about any IBM manager to a more senior manager. (Open Door Policy, Def. Ex. 22.) On March 3, 1995, two days after he filed his Speak Up complaint, Scott received another call telling him that IBM had commenced an internal "Open Door" investigation concerning his complaints. (Scott Dep. I at 190:7–191:8.)

IBM assigned a black executive level employee, Mark Eaton, to conduct the Open Door investigation. (*Id.* at 191:19–20.) Eaton met with Scott on several occasions, and also met with Johannessen, Weiss and Biggs. Scott complained to Eaton that Johannessen's evaluation was not based on sufficient information, and maintained that race somehow must have been involved. (*Id.* at 194–95.) Eaton's investigation led him to conclude that Johannessen had mishandled the evaluation with respect to the manner in which he delivered the report to Scott, but found no grounds to change Scott's rating from a "3" to a "2". Eaton also concluded that Scott's claim of a denial of promotional opportunity referred only to a temporary assignment in 1982, some thirteen years earlier, and that there was no evidence of race discrimination with respect to the 1995 or 1982 incidents. Finally, Eaton found that while Weiss's tone and word selection could have been perceived as threatening, Weiss did not intend to threaten Scott. (Eaton Report, Def. Ex. 20 at D–902.) Eaton dis-

---

**2.** Although plaintiff did not say so to Weiss, the promotional opportunity to which he referred was his recollection that in 1982 he was transferred back to New Jersey from a temporary assignment in North Carolina because his boss in New Jersey wanted to keep the number of minority employees high. (*Id.* at 152:17–154:8.)

cussed these findings with Scott. (Scott Dep. I at 207–208.) Based on Eaton's findings, on April 5, 1995 IBM sent plaintiff a letter informing him that Mr. Johannessen should have handled the January 1995 performance evaluation in a "more appropriate manner", but that Mr. Scott's evaluation rating would not change. (Ltr. From J.R. Canavan, Def. Ex. 32.)

In a move unconnected with Scott's above-detailed complaints, IBM in December 1994 appointed Mark Warren, a black male, to replace Bruce Johannessen as the manager for the group of customer engineers that included Mr. Scott. (Biggs Dep. at 67–68, Def. Ex. 9.) After managing Scott for several months, Mr. Warren met with him in mid–1995 to discuss the concept of "teamwork" on the teams charged with installing large mainframe computers, and the related necessity of employees to seek out greater responsibilities to broaden their work experiences. The conclusion Warren reached from his discussion with Mr. Scott was that:

> Mr. Scott chose not to be a volunteer for anything. He would prefer to act as a team player as to support the guys back in the field rather than volunteer [for additional training or classes]. If guys wanted to go to school and/or things like that, Scott would cover them, cover their territory, and that was his way of being a team player.

(Warren Dep. I at 102:2–8, Def. Ex. 3.) Warren told Scott he wasn't satisfied with Scott's response, and that he should be looking to enhance his own skills by participating in different types of installations and by volunteering for large system install teams. (*Id.* at 103, 106:13–107:1.)

Around this same time, IBM was experiencing declining revenues and already had undergone two reduction in force actions. *See Big Loss for IBM in Quarter*, N.Y. Times, April 23, 1993 at D1; *IBM Chief Making Drastic New Cuts; 35,000 Jobs To Go*, N.Y. Times, July 28, 1993 at A1. IBM employees were informed during staff meetings around this time that IBM was "raising the bar". That is, IBM employees needed to be more productive in order for the company to remain competitive, and that more would be expected of them, "people would be asked to do more, take on more responsibility, more than they had in the past". (Eaton Dep. at 100:23–101:9.)

The revenues for Mr. Scott's particular area of expertise had been steadily declining throughout the 1990's. Computers were more reliable and needed less servicing, and IBM's mid-New Jersey branch had lost several accounts to smaller competitors. Accordingly, the workloads for customer engineers were down. (Eaton Dep. at 57–59; Johannessen Dep. at 26–27, 39, 75, Def. Ex. 8.)

In October 1995 Warren assigned Scott to be the primary customer engineer for a large computer center located at the McGraw Hill's New Jersey offices. Warren later testified that part of the reason that he assigned Scott to this account was to enhance Scott's rating by allowing him to manage a large account. (Warren Dep. II at 35, Def. Ex. 5.) Thereafter, Warren received two calls from McGraw Hill management complaining about Mr. Scott. In the first, a McGraw Hill representative complained about covers being left off a machine and cables not being properly placed under floor tiles, and said he no longer wanted Scott on the account. Warren replied that IBM couldn't simply move people on the basis of a single complaint, and that McGraw Hill needed to give Scott a chance. (Warren Dep. I at 141:9–16.) The second call came in November 1995, when Warren received a call from another McGraw Hill representative stating IBM "had to remove [Scott] from the account because he was not working out with the McGraw Hill team". (*Id.*) In November or December 1995 Warren removed plaintiff from the McGraw Hill account. Warren acknowledges that he never heard any other complaints about plaintiff from any other customers. (Warren Dep. I at 146:10–13.)

In January 1996, Warren met with plaintiff to discuss Warren's annual appraisal of Scott under the Personal Business Commitments (PBC) evaluation program adopted in 1995. Under the PBC program, there were three categories used for overall ratings: (1) "results were extraordinary", (2) "results achieved all commitments", and (3) "more is

expected". (1996 Evaluation, Def. Ex. 25 at D–53.) Warren rated Scott under the third category, "more is expected". Warren's "overall assessment" of Mr. Scott in the January 1996 PBC stated:

> Henderson has shown at all times he could be a consistence [sic] contributor of most of the above objectives. The area I feel could be improved, is more consistency in Teamwork. Henderson needs to get more involved with install teams in and outside of the territory. In [so] doing I feel he would have more of an opportunity to develop his skills and share more of his experiences. Though Henderson has made some contribution to our overall customer satisfaction objective, some improvement is still needed.

(*Id.* at D–53.)

In December 1995, IBM manager Ken Boutot, who had replaced Ms. Biggs as Warren's supervisor, was informed by senior management that there would be an involuntary reduction in force (RIF) by IBM which would affect several regions within North America, potentially including customer engineers in New Jersey such as Mr. Scott. (Boutot Dep. at 67–72, Def. Ex. 12.) Boutot received a "manager's package" of information concerning the 1996 employee reduction, called the Availability Services Transition Payment Plan (ASPP), a plan governed by ERISA. (*Id.* at 79–81; ASPP Manager's Package, Def. Ex. 26.) The ASPP manager's package described procedures to be followed to identify employees to be included in the ASPP. According to a summary statement, under the ASPP plan managers were to "define skill families", "identify required skills/number to remain"; "review qualifications of each employee against requirements"; "document skills/assessment"; "select best qualified employee(s)"; and "identify surplus employee(s)". (ASPP Manager's Package at D–380.)

In January 1996, over the course of three meetings, Boutot distributed the ASPP directives to the 10 managers who reported to him. (Boutot Dep. at 91:16–25, Def. Ex. 12.) During the first meeting, Boutot tried to impress upon the managers the gravity of the task they were undertaking. Boutot em-phasized that the determination of which workers should be fired, or "surplused", depended on an analysis of "what skills we need to go forward in the business." (*Id.* at 86:15–22.) However, during this first meeting, the managers did not specifically define how they intended to select the employees to be surplused.

Between the first and second meetings, even before the managers had defined how they intended to evaluate the employees eligible for surplusing, plaintiff's supervisor Mr. Warren ranked his customer engineers, including Mr. Scott, using the type of criteria described in the manager's package. (Warren Dep. II at 9:5–23, Def. Ex. 5.) Scott ranked fourth out of five in this ranking. Warren maintains that he did this ranking without input from Boutot or other managers. (*Id.* at 34:18–35:7.)

At the second meeting, Boutot and his managers attempted to define the skills that would be evaluated, and tried to develop commonly understood terms to be used. Once the managers had fully discussed the parameters of the ASPP RIF, the ASPP directives were written on a flip chart in the corner of the room. On this chart there were two columns. On the left side were the terms to be used in assessing an individual employee's skill level and value to IBM. On the right side there was a further definition of the term and how to measure it. This flip chart was the sole documentation of how Boutot and his managers intended to implement the ASPP directives. (*Id.* at 92:13–24.)

Unfortunately, this flip chart was destroyed, probably the day after the meeting, denying plaintiff the ability to discover exactly what the managers wrote down during the decision-making process. Specifically, there now is no original documentation regarding the managers' definitions of what qualities and skills were important in determining which employees were to be surplused in accord with the ASPP directives. Boutot has testified that he does not remember what terms were defined and put on the flip chart, nor does he remember how many were used. (*Id.* at 94:19–95:3.)

At the end of the second meeting or the beginning of the third, the discussion between Boutot and his managers turned to focus on individual employees. There were a total of approximately 130 employees that reported to the 10 managers who in turn reported to Boutot. Of this group of 130, 72 customer engineers, including Mr. Scott, who were in the "large systems skill group". (*Id.* at 146:19–22.) Warren has testified that the discussion at the third meeting focused on the "bottom individuals" which each manager had ranked before the meeting began, and that at some point during the discussions the customer engineers were ranked from one to 72. (Warren Dep. II at 10:7–22.) After this ranking of the 72 customer engineers had been completed, approximately nine employees were listed for potential termination, of whom five were eventually laid off. (Discharge List, Def. Ex. 30.) The five included Mr. Scott. Significantly, there is no original documentation as to who the nine potential surplus employees were, nor where Mr. Scott ranked on this list in relation to the others.

Warren met with Scott at the end of January 1996 to inform him that he had been declared surplus, and that unless he could secure other employment at IBM his last day would be at the end of March 1996. (Scott Dep. I at 274:20–275:9.) In the meantime, Warren explained, Scott did not need to show up to work, and his accounts would be distributed to other customer engineers, all of whom turned out to be white males younger than plaintiff. (*Id.* at 284:20–285:16.)

In an affidavit addressing his reasons for recommending that Mr. Scott be declared "surplus", Warren averred that, although he considered Scott a capable engineer, he lacked the attributes necessary for IBM to compete in the future with a reduced workforce. (Warren Aff. ¶ 5, Def. Ex. 6.) Specifically, Warren points out (1) Scott's failure to expand his work experiences by seeking additional work assignments, (2) Scott's inadequate ability to work independently and tendency to call for assistance on routine matters, and (3) Scott's inadequate leadership abilities and tendency to take a "back seat" to other engineers and specialists on install teams. (*Id.* ¶¶ 8–10.) A final matter listed by Warren was the situation at McGraw Hill, which he contends was significant because no other IBM customer had made a similar request to Warren to remove a specific engineer from a site. (*Id.* ¶ 10.)

After Warren informed Scott that he was to be laid off, Scott refused to sign the "no-sue" agreement required to receive severance pay. Scott continued to draw his paycheck from IBM over the next two months (Scott Dep. II at 9:6–10.)

Thereafter, plaintiff filed a discrimination complaint with the EEOC dated March 8, 1996. (EEOC Charge, Def. Ex. 29.) In this charge, plaintiff claimed that he had been discharged and retaliated against in violation of the ADEA, the ADA, and Title VII. (*Id.*)

By mid-March, 1996 Warren "had gotten word that Scott had mounted a lawsuit against IBM Corporation", and had also been informed "that Mr. Scott was still visiting certain accounts, IBM accounts, IBM assets." (Warren Dep. I 165:12–19.) Scott claims that these continued contacts with his old accounts were simply an effort by him to collect letters of reference to be used in his new job search.

In response to learning about the EEOC complaint and Scott's continued contact with his old accounts, Warren and head of human Jim Bowdre made the decision to "get [Scott] off PROFs". PROFs being IBM's internal network where all internal notices of jobs within IBM were posted. This decision was implemented by revoking plaintiff's password, which made it impossible for him to access IBM's internal network. Plaintiff alleges that this decision made it impossible for him to access internal job postings at IBM, which in turn made it harder for him to gain further employment at IBM, and thus he was harmed and retaliated against by IBM's revocation of his PROFs password. IBM has not explained how cutting Mr. Scott off of PROFs would discourage him from contacting IBM accounts.

Plaintiff filed suit in state court on July 20, 1998, after which defendant removed to this Court on August 31, 1998.

## DISCUSSION

### A. Summary Judgment Standard

A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding whether there is a disputed issue of material fact the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080–81 (3d Cir.1996); *Kowalski v. L & F Prods.*, 82 F.3d 1283, 1288 (3d Cir.1996); *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that: "[w]hen the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329–330 (3d Cir.1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). However, "the nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial." *Brewer*, 72 F.3d at 330 (citing *Anderson*, 477 U.S.

at 248, 106 S.Ct. 2505). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### B. Discriminatory Discharge Claims

#### 1. McDonnell Douglas Evidentiary Framework

The Court next considers plaintiff's allegations of discriminatory discharge in violation of the ADA,[3] the ADEA,[4] and Title VII of the Civil Rights Act of 1964.[5]

Because Scott has only indirect or circumstantial evidence that defendants discriminated against him on the basis of his race, age, or disability, the familiar *McDonnell Douglas* Title VII burden-shifting rules apply to plaintiff's claims of discriminatory treatment under the ADA, the ADEA and Title VII. *See Walton v. Mental Health Assoc. of Southeastern Pennsylvania*, 168 F.3d 661, 668 (3d Cir.1999) (*McDonnell Douglas* framework applies to ADA claims); *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997) (en banc) (framework applies in ADEA cases).

Under this framework, in a discriminatory discharge claim brought under Title VII, the initial burden of production is on the plaintiff to establish a prima facie case of discrimina-

---

**3.** The core anti-discrimination section of the ADA provides that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.

**4.** The ADEA provides that it shall be unlawful for an employer:

> [T]o fail or refuse to hire or to discharge any individual or otherwise discriminate against

any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age.

29 U.S.C. § 623.

**5.** The core anti-discrimination section of Title VII provides that:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000E(a)(1).

tion. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061 (3d Cir.1996) (en banc), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). The phrase "prima facie case" means that the plaintiff's burden is to produce enough evidence to permit the trier of fact to infer the fact at issue. *Burdine,* 450 U.S. at 254, n. 7, 101 S.Ct. 1089.

To meet the prima facie burden in a RIF case, a plaintiff must show: (1) he is a member of a protected class; (2) that he was discharged, (3) that he was qualified for the position from which he was discharged; and (4) that the employer retained unprotected workers. *Keller,* 130 F.3d at 1108; *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994), *abrogated on other grounds by Smith v. Borough of Wilkinsburg,* 147 F.3d 272, 277 (3d Cir.1998). A defendant in a discriminatory discharge case is entitled to summary judgment if the plaintiff fails under this standard to establish a prima facie case of discrimination. *Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Stinson v. Delaware River Port Auth.,* 935 F.Supp. 531, 539 (D.N.J.1996), *aff'd without op.,* 124 F.3d 188 (3d Cir.1997).

Once a plaintiff has established a prima facie case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the discharge. *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Hicks,* 509 U.S. at 506–07, 113 S.Ct. 2742. An employer satisfies this burden by introducing evidence which, taken as true, would permit a trier of fact to conclude that unlawful discrimination was not the reason for the discharge. *Burdine,* 450 U.S. at 254–56 and n. 8, 101 S.Ct. 1089. However, an employer need not prove that the proffered reason actually motivated its behavior. *Id.* Instead, it is sufficient if the defendants' evidence raises a genuine issue of material

fact as to whether it discriminated against the plaintiff. *Id.* at 254 n. 7, 101 S.Ct. 1089.

Once an employer meets its burden of producing a legitimate, nondiscriminatory reason for plaintiff's dismissal, the burden of production shifts back to the plaintiff, who must show by a preponderance of the evidence that the employer's proffered explanation for the discharge is pretextual and that the employer's true motivation was discriminatory. *McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253, 256, 101 S.Ct. 1089; *Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742. "It is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Hicks,* 509 U.S. at 519, 113 S.Ct. 2742 (emphasis in original).

A plaintiff can discredit an employer's explanation by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* find them unworthy of credence and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons." *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994) (emphasis in original) (citations and internal quotes omitted). A defendant is entitled to summary judgment at this stage if the plaintiff has not produced sufficient evidence to rebut the defendant's proffered nondiscriminatory explanation for the discharge. *Sheridan,* 100 F.3d at 1072.

### 2. *Plaintiff's Claims of Discriminatory Discharge*

#### a. *Prima Facie Case*

Defendant has conceded that plaintiff has established a prima facie case under Title VII and the ADEA, and the Court finds that plaintiff, a black male over 40 years of age who was terminated while non-protected employees were retained, has established a prima facie case under these Acts.

Nevertheless, IBM disputes whether plaintiff has established a prima facie case under the ADA. Mr. Scott's disability claim is premised on a medical notation placed in his file by IBM's medical department counseling

that Scott was "not to lift over 35 pounds" and "no pushing or pulling motions." (Pl.Ex. H at 1.) Plaintiff argues that Warren was aware of plaintiff's lifting restrictions, and penalized him for this disability by rating him poorly during the RIF because Scott would not volunteer for additional assignments, such as large system installations, that he was physically unable to do. IBM counters that, despite the lifting restrictions placed in his file, plaintiff was not "disabled" for the purposes of the ADA, is not protected by that act, and thus has not established a prima facie case of disability-based discharge.

The relevant facts are that Scott had two auto accidents, one in 1957 and the other in 1967. He began working for IBM in 1973. Sometime around between 1976–78 Scott began to have some back pain, and requested that the IBM medical staff evaluate him. (Scott Dep. I at 17:3–15.) As a result of this evaluation, IBM placed into Scott's file the lifting restriction upon which he bases his disability claim. Scott initially did not know of the lifting restriction, and cannot remember at what point he became aware of it after it appeared in his file in the mid-to-late 1970s. (Id. at 23:3–5.)

Regardless of whether or not he knew about the lifting restriction, it is manifest that Scott's past back injuries did not affect his ability to lift or pull. Scott has testified that he never told IBM management that he was unable to push or pull heavy equipment, and does not recall ever telling the management that he couldn't do a job. Moreover, Scott never stated to his supervisors that he had a medical condition that would keep him from working on heavy equipment. (Id. at 23:14–24:25.) This was despite the fact that from 1983 until 1996 he worked on fixing large mainframe IBM model 3090 computers that weighed upwards of 3000 lbs. and re-

quired installation of 40, 50, and 100 foot cables that must be manually pulled from the floor. (Id. at 21:21–22:21.) Indeed, Scott has testified that he "did all those things anyway" that were covered by the restriction in his medical file: "I pushed and pulled things, lifted more than 35 pounds. I did all the things that the restriction says I shouldn't do. So I never even adhered to it. It was just in my record. That's all." (Id. at 19:18–20:2.) Furthermore, Scott testified that he has not received any care or therapy in connection with his back problems since the 1970s. Thus at the time of his termination, he had been complaint-free for approximately twenty years. (Id. at 14:16–22.)

The ADA was enacted to protect those individuals who can establish that they are "disabled", not to protect those suffering from "minor, trivial impairments". *Marinelli v. City of Erie*, 216 F.3d 354, 356 (3d Cir.2000) (quoting HR Rep. No. 101–485(II), 101st Cong.2d Sess. at 52, 1990 U.S.Code Cong. & Admin.News at pp. 303, 334). In order to state a cognizable cause of action under the ADA, a plaintiff must establish that he is a "qualified individual with a disability" restricted in his ability to perform important life activities in comparison to most people. *Id.* at 359 (quoting 42 U.S.C. § 12112(a)). "Disability" is defined as either (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual"; (2) "a record of such impairment", or (3) "being regarded as having such an impairment." *Id.* at 359 (quoting § 12102(2)(A)-(C)). Scott attempts to proceed under all three definitions of disability, claiming that the medical restriction in his file is an admission that he was at all relevant times substantially limited in a "a major life activity, work." (Pl. Br. at 18.) [6].

---

6. Plaintiff later changed the focus of his ADA claim from work limitation to walking limitation. In a letter brief submitted on February 25, 2000, plaintiff asserted for the first time that he was also substantially limited in walking because his pronounced limp, and therefore is disabled. (Pl. Ltr. Dated 2/25/2000 at 5.) Disability on account of a walking limitation is a distinct theory from limitation in ability to work, and plaintiff was charged with the responsibility to timely serve notice that such a theory was being pursued.

Simply mentioning a claim in a supplementary letter brief and providing a citation to relevant authority does not create a new cause of action in an on-going case. Plaintiff never made mention of any disability related to walking in his administrative claim or in his complaint in this case. Accordingly, the Court will not entertain this apparent attempt to amend plaintiff's claims in this late stage of the litigation, when prior pleadings failed to mention this claim, discovery

■ The Supreme Court has emphasized that an impairment does not necessarily equate to a disability under the ADA; the plaintiff has the burden of showing that he suffered in fact from a substantial limitation of a major life activity as a result of the impairment. *See Sutton v. United Airlines,* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). *See also Murphy v. United Parcel Service,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999); *Albertson's Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). The substantial limitation must exist "presently—not potentially or hypothetically" in order to demonstrate a disability. *Sutton,* 527 U.S. at 482, 119 S.Ct. 2139.

■ Here, Mr. Scott has not shown that he suffered an impairment causing a present substantial limitation, nor has he demonstrated a record of impairment. The *only* objective evidence of impairment Scott offers is a decades-old medical notation in his personnel file. Even though the parties agree that this notation is authentic and was placed in Scott's file by IBM personnel, this document alone does not allow plaintiff to survive IBM's summary judgment motion as to his ADA claim.

For reasons now explained, this notation is of limited evidentiary value, and fails to create a genuine issue as to whether plaintiff suffered from a disability for the purposes of the ADA. First, the notation does not indicate who created it. There is no indication whether the drafter is a Medical Doctor, a nurse, or a computer technician. Accordingly, it is impossible to tell whether this note would qualify as medical testimony on the subject of Scott's disability under Rule 803(4), and would likely be excluded at trial under the rule against hearsay. Second, because of the terse and undetailed nature of this notation, it is impossible to tell whether the lifting restriction was in response to plaintiff's original back injuries suffered in the late 1960s, or was instead responsive to a new, acute injury suffered by plaintiff in the mid–1970s. Because it is unclear whether the lifting restriction referred to an ongoing

impairment or a transient condition, it is unreliable evidence of a long-term disability. Third, this notation is exceedingly stale, and does not speak to whether plaintiff suffered from a disability during the time period relevant to this case. As noted above, IBM placed the lifting restriction in plaintiff's file sometime in the mid–1970s. Plaintiff never had any follow up evaluations, nor has he had any continuing treatment. While the notation may have been competent evidence of an impairment some twenty years ago, there are no corroborating documents showing the continued validity of this lifting restriction, and it is of no probative value regarding his actual physical abilities in the 1990s. The Court finds that, without more, one uncorroborated notation dating from 1978 does not create a genuine issue as to whether Scott was impaired in his lifting and pulling ability in 1996.

Moreover, plaintiff's own testimony undermines his contention that his alleged lifting impairment somehow disabled him from working. As stated above, Scott unequivocally testified that, despite the lifting restriction in his file from 1978, he was not in fact limited in his ability to lift cables or work with large mainframe computers. In essence, plaintiff wants the protection of the ADA for an inability to work despite having stated on the record that he is not impaired in his ability to do his job. This fails the *Sutton* requirement that in order to qualify as a disabled person under that Act, Scott must show that he is presently—not hypothetically or potentially—substantially limited in his ability to work as compared with the average person. Granting ADA protection to a plaintiff who has unequivocally stated that he was unimpaired in his ability to do his job also would violate the spirit of the ADA, which was not designed to protect those with trivial or minor impairments. *Marinelli,* 216 F.3d at 356.

■ Plaintiff also has failed to adduce evidence from which a jury could conclude that he was "regarded as" disabled. Under Supreme Court precedent, a plaintiff who

has been closed for almost a year, and plaintiff has produced no expert testimony to support his

new theory that he was disabled because of a substantial limitation of walking ability.

claims that his employer regarded him as disabled must show, at the very least, that his employer regarded him as having a "substantially limiting impairment", *i.e.*, an impairment that would preclude plaintiff from a broad range of jobs. *Sutton,* 527 U.S. at 482, 119 S.Ct. 2139. Scott has not made such a showing. Even assuming that his supervisors were aware of the medical notation in his file, there is no evidence that Warren or any other supervisor based any of their decisions on Scott's ability to lift or pull. Moreover, there is no evidence that IBM limited Scott's assignments or tasks based upon this notation or any perception of disability related to lifting or pulling at any relevant time. Scott never requested relief or accommodation for an impairment, never told his managers that he had a lifting restriction, and never limited his own activities.

Plaintiff asserts that Warren must have regarded Scott as disabled simply because he walked with a marked limp, and because Warren downgraded Scott based on his refusal to volunteer for large mainframe installations. These arguments are without merit. First, the mere fact that a supervisor regards an employee as having a limp does not mean that the supervisor regards the employee as disabled. *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir.1996). Second, there is no evidence that Scott ever voiced concern over a purported inability to work with heavy mainframes, and no evidence that Warren regarded him as unable to do so. To the contrary, Scott had undertaken mainframe installations in the past, and Warren logically expected Scott to be able to participate in more of them as part of increasing his skill set. There is simply no evidence from which a jury could find that Warren believed Scott to be unable to work on heavy mainframes— only evidence that Scott did not volunteer to do more installations of that type.

Based on the foregoing, the Court concludes that plaintiff has failed to meet his burden of establishing a prima facie case of disability discrimination under the ADA. Plaintiff has not adduced evidence from

which a reasonable jury could find that he was substantially limited in his ability to lift, nor has he adduced any evidence that his back problems otherwise limited him in his ability to perform his job at IBM or that he was regarded as having such limitations. Accordingly, the Court will enter summary judgment against his claims of discrimination under the ADA.[7]

### b. *IBM's Proffered Legitimate Reasons for Discharge*

 Having determined that plaintiff's ADA claims must be dismissed, the Court turns to consider plaintiff's claims under the ADEA and Title VII. Because IBM has already conceded that plaintiff has established a prima facie case under these Acts, IBM at this stage must articulate legitimate, nondiscriminatory reasons for Scott's inclusion in the 1996 RIF.

IBM unquestionably has articulated legitimate reasons for firing Mr. Scott. As discussed above, IBM experienced substantial and well-publicized business difficulties in the early and mid–1990s. In 1996, the IBM branch in which Scott worked was included in a company-wide RIF plan called ASPP. As part of this process, Scott's regional manager, Boutot, conducted three meetings with the managers that reported to him, including Scott's immediate manager, Warren, to discuss the ASPP and the criteria against which employees should be evaluated. At the final stage of this process, Boutot and his managers developed a ranked list of about nine large system customer engineers for possible inclusion in the RIF. Mr. Warren alone provided input on Mr. Scott, and, based on Warren's assessment of him, Scott was included in the five customer engineers terminated as part of the ASPP process.

Warren has stated that he made the decision on how to rank the employees under his management, including Mr. Scott. Under the ASPP guidelines, Warren and other managers understood that they were to "raise the bar" for IBM employees, such that merely competent performance might no longer be enough. While Warren regarded Scott as a

---

7. This finding obviously moots plaintiff's motion for summary judgment in his favor upon his ADA claims.

capable customer engineer, he ranked him lower than his peers based on (1) Scott's failure to seek out additional assignments and experience, (2) Scott's inadequate ability to work independently and to call for assistance with routine tasks, and (3) Warren's observation of Scott taking a back seat role to others on the team rather than an active leadership role, and (4) complaints about Scott from IBM's customer McGraw Hill, for which Scott was the primary customer engineer.

Based on IBM's financial difficulties, the organized manner in which it determined which employees would be terminated as part of the RIF, and Warren's testimony regarding the criteria he used to determine that Scott should be ranked lower than most of his peers during the ASPP process, IBM has plainly proffered legitimate reasons for Scott's discharge.

### c. *Pretext & Spoliation*

■ The Court having determined that IBM has articulated legitimate reasons for firing Mr. Scott, the Court turns to consider whether plaintiff has cast sufficient doubt on these proffered reasons that a jury could disbelieve them, or could find that discrimination is more likely than not the real reason for Scott's dismissal. As the Third Circuit has explained there are two prongs by which a plaintiff may establish pretext:

> [B]ecause the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered nondiscriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (1) discrediting the proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative

cause of the adverse employment action. Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case.

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)(emphasis in original); *see also Sheridan*, 100 F.3d at 1065–72 (reaffirming pretext standard set forth in *Fuentes*). In this case, plaintiff seeks to show pretext via both prongs of the *Fuentes* test.

#### i. *Prong One*

The bulk of plaintiff's briefing on the subject of pretext is dedicated to arguing that IBM has committed evidence spoliation by destroying several key pieces of evidence in this case, and that this spoliation warrants sanctions including striking IBM's defenses and entering summary judgment in plaintiff's favor.[8] For reasons now explained, the Court finds that under the particular facts of this case, IBM's decision to destroy these documents could give rise to a "spoliation inference" which could be found by a reasonable jury to cast doubt on IBM's proffered legitimate reasons for discharge, and thus establishing pretext for both plaintiff's Title VII and ADEA claims. However, the Court will impose no further sanctions in connection with this alleged spoliation, because a reasonable factfinder could also conclude that the absence of these documents is innocent.

Plaintiff argues that Boutot and the IBM managers who reported to him deviated from the official instructions in the ASPP manual, and created their own code for determining which employees would be included in the RIF. It is difficult to discern from the factual record what were the specifics of Boutot's code, primarily because the flip chart and other documents recording the decision-making process were destroyed shortly after the ASPP meetings took place. These charts

---

**8.** While plaintiff disagrees with many of Warren's assessments of Scott (*see* Pl. Mat. Facts ¶¶ 60–65), simple disagreement does not amount to pretext. A plaintiff must show that the employer's proffered reasons were so plainly wrong that they could not have been the real reason for discharge. *See Keller,* 130 F.3d at 1109. Plaintiff's basic disagreements with the wording of Warren's reports does not meet this standard.

included at a minimum the definitions and standards that Boutot stated were extensively discussed and used during the selection process, and the rank order of the bottom nine employees identified as subject to layoff. Plaintiff maintains that he has been prejudiced by IBM's decision not to retain this documentation because he has been deprived of complete discovery of the actual operation of the selection process. During their depositions, managers Boutot and Warren were vague as to what criteria was emphasized during the selection process, and could not remember the ranking of the individuals identified as appropriate for layoff. Accordingly, plaintiff contends, the destruction of the flip chart and name ranking has deprived him of any objective evidence concerning whether IBM truly followed the ASPP parameters when deciding to include him in the RIF.

■ The Court agrees with plaintiff that, because the flip chart was destroyed, there is little documentation as to what really went on during the RIF decision-making sessions. Accordingly, beyond the testimony of IBM managers, there is no way to ascertain whether plaintiff was evaluated according to IBM norms, or was instead fired on account of his race, age, or in retaliation for his prior complaints about race discrimination within the company.[9]

■ The question of whether the destruction of this RIF related evidence warrants spoliation sanctions requires further analysis. At the outset, the Court notes that there are two branches of the law of evidence spoliation. Spoliation can be asserted as an independent cause of action for money damages under state law, under which certain essential elements must be proved. *See e.g. Cedars-Sinai Med. Ctr. v. Superior Court,* 18 Cal.4th 1, 74 Cal.Rptr.2d 248, 954 P.2d 511 (1998); *Holmes v. Amerex Rent–A–Car,* 710 A.2d 846 (D.C.App.1998); *Hirsch v. General Motors Corp.,* 266 N.J.Super. 222, 628 A.2d 1108 (1993). Alternatively, evidence of spoliation can be asserted against an adversary as a basis for discovery sanctions under court rules. *Hewitt v. Allen Canning Co.,* 321 N.J.Super. 178, 728 A.2d 319 (App.Div.1999).

---

9. Plaintiff seeks to exclude from evidence a recently discovered piece of evidence, the technical workbook containing Boutot's notes on the ASPP process (the "Boutot notebook"), which was not produced during regular discovery. Indeed, at his first deposition in April 1999, Boutot was questioned by plaintiff's counsel about the whereabouts of this notebook, and maintained that it already had been destroyed. (Boutot Dep. 73:24–74:13.) Nevertheless, IBM offered the notebook as defendant's evidence after Boutot found it inside an unrelated file around January 2000, during the course of moving his residence in Crandall, NJ to Piscataway, NJ. Because the Boutot notebook was produced long after the close of discovery, the Court allowed supplemental discovery and briefing on the issue of whether to allow the notebook into evidence. Plaintiff accordingly has moved for an order barring IBM (1) from using this exhibit at trial or in motions, (2) barring IBM from using Boutot's testimony concerning this notebook, and (3) imposing costs. (Pl. Notice of Motion dated March 20, 2000.)

Exclusion of evidence under Rule 37(c)(1), Fed.R.Civ.P., is a severe sanction and is often inappropriate unless the failure to disclose or supplement is in bad faith or the resulting prejudice cannot be cured. *See In re TMI Litig.,* 193 F.3d 613, 721–22 (3d Cir.1999). Plaintiff has not made any showing of bad faith in the revelation of the Boutot notebook. Simply because it was untimely discovered and turned over does not warrant its exclusion. The circumstances of Boutot's retention, storage and discovery of his notebook were explored fully and disclose no misconduct by Boutot or IBM.

Moreover, a review of the notebook shows that the plaintiff will suffer little prejudice from its use at trial. As plaintiff notes, "[t]he entries in the Boutot notebook are not complete sentences. The entries are generally meaningless without information as to the context which prompted Boutot to write them down. The Boutot notebook is therefore a collection of cryptic jottings characteristic of an aide-de-memoire". It is difficult to fathom how plaintiff will be prejudiced at trial by the introduction of a book of incomplete jotted thoughts, especially when (1) Boutot will be available for cross-examination should IBM rely on the notebook, and (2) the notebook still does not prevent the possibility of the spoliation inference flowing from IBM's destruction of the documents related to ranking the employees subject to discharge during ASPP process. Indeed, subsequent to the discovery of the Boutot notebook, the Boutot deposition was reconvened and plaintiff had the opportunity to fully examine Boutot about his notes in February, 2000. Because there is no evidence of bad faith in the revelation of the notebook, and because the Court finds that its introduction creates no undue prejudice to plaintiff, the Court will deny *plaintiff's motion concerning the Boutot notebook.*

While there is no independent tort of evidence spoliation under federal law, the Supreme Court has recognized that spoliation sanctions may be imposed as part of the inherent power of a district court to sanction parties. *See e.g. Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

When presented with evidence of spoliation, the Court must first determine whether to exercise its inherent power to sanction under *Chambers v. NASCO*. Such sanctions are available in the extraordinary case where necessary to preserve the integrity of the tribunal's process itself.

In *Chambers*, the Supreme Court held that federal courts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." The Court cautioned, however, that this power should exercised with restraint and only in narrowly defined circumstances, such as where

> a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.... In this regard, if a court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.

*Id.* at 45–46, 111 S.Ct. 2123 (citations and quotation marks omitted). *See also Loatman v. Summit Bank*, 174 F.R.D. 592, 605 (D.N.J.1997).

The Third Circuit has admonished district courts to exercise with due care their inherent power to sanction. For example, in *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir.1994), the Third Circuit stated: "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent power, and must also ensure that the sanction is tailored to address the harm identified." The court noted that the sanctioning district court should be careful to sanction the appropriate, culpable individual, whether he or she is a litigant or an attorney in the case. *Id.*

The Court finds, upon this initial inquiry, that plaintiff has not demonstrated that IBM's conduct in discarding these documents rises to the standards necessary to trigger sanctions articulated in *Chambers.* There is no direct evidence that the documents were knowingly destroyed after plaintiff filed his EEOC complaint, nor did they "disappear" after a court order for their production. The circumstances are also susceptible of an innocent explanation, including mere negligence in failing to preserve possibly important documents. Plaintiff's motion for such sanctions will be denied.

The second inquiry then becomes whether these circumstances of spoliation, although not rising to the level of sanctionable conduct, should nevertheless give rise to a jury instruction regarding the spoliation inference.

Such a jury instruction permits an inference, the "spoliation inference", that the destroyed evidence might or would have been unfavorable to the position of the offending party. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir.1994). When the contents of a document are relevant to an issue in the case, the spoliation inference is nothing more than the common sense observation that a party who destroys relevant evidence did so out of a well-founded fear that the contents would harm him. *Brewer v. Quaker State Oil Refining* Corp., 72 F.3d 326, 334 (3d Cir.1995); *Schmid*, 13 F.3d at 78 (quoting *Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218 (1st Cir.1982) (Breyer, J.)).

Assessing the effect of the spoliation inference is an individual inquiry. In determining whether the inference should apply it is essential that the evidence in question be under the adverse party's control. Further, it must appear that there has been an actual suppression of this evidence, i.e., that it was destroyed intentionally and not as a matter of routine disposal. *Brewer*, 72 F.3d at 334 (citing 31A C.J.S. Evidence § 156(2); 29 Am. Jur.2d Evidence § 177). It also must be shown that the evidence destroyed was relevant and that it was reasonably foreseeable that it would later be discoverable. Jamie S.

Gorelick, *Destruction of Evidence* § 3.11 (1989 & Supp.1998). While a litigant is under no duty keep or retain every document in its possession, even in advance of litigation it is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation. *Cf. Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1455 (C.D.Cal. 1984) (citing *In re Agent Orange Product Liability Litig.*, 506 F.Supp. 750 (E.D.N.Y. 1980)).

In this case, the Court finds that a spoliation inference could be drawn from IBM's destruction of documents related to the ASPP, and that this inference in turn could provide evidence from which a reasonable jury might disbelieve IBM's articulated reasons for dismissal. IBM certainly was aware that any documents relating to the ASPP process would be subject to discovery. Among the facts from which a jury could conclude that IBM is responsible for spoliation are that the detailed manager's ASPP package was drafted in an effort to provide fail-safe, nondiscriminatory guidelines governing the process. Due to the detail and care required by this manual, it may be inferred that IBM thus put its managers on notice of the sensitive nature of the layoff, and the need to preserve all relevant evidence. Second, while litigation was not guaranteed, it could be viewed as reasonably foreseeable. IBM managers knew that Mr. Scott, if not others included in the RIF, were protected by federal employment discrimination laws. Mr. Scott had made previous claims of race discrimination within IBM, and thus IBM had ample notice that it was discharging a potentially litigious employee when it fired him. Common sense would dictate preserving all helpful documentation when dealing with the discharge of a employee with a litigious history. Because IBM did not do so, the inference may reasonably be drawn that the destroyed documents were unhelpful to IBM's case. Finally, IBM tacitly acknowledged that litigation was foreseeable when it required all employees laid off in the RIF to sign a contract waiving their right to sue IBM before releasing their severance package benefits, to which Scott himself refused to agree. Based on the forego-

ing, the Court finds that IBM should have foreseen that litigation might follow the RIF and should have foreseen that all documentation concerning the ASPP process could become relevant. It follows that a negative inference, the "spoliation inference", might reasonably be drawn from IBM's decision to destroy these relevant documents. While the Court does not suggest that all documents related to every layoff should be kept, the particular facts of this case reasonably may allow a negative inference to be drawn by a jury from the failure to retain the records of IBM's selection of Mr. Scott for termination.

■ Having determined that a spoliation inference may be drawn from IBM's destruction of relevant evidence in this case, the Court addresses the question of whether this negative inference may serve as evidence of pretext under the *McDonnell Douglas* framework. While the Court's research has not revealed any cases explicitly translating evidence of spoliation into evidence of pretext, the Court finds that this interpretation is warranted in this case. A plaintiff seeking to establish pretext is entitled to point to direct or circumstantial evidence from which a jury could find pretext. *Sheridan*, 100 F.3d at 1066. Similarly, plaintiff, as the party opposing summary judgment, is entitled to all favorable inferences from these circumstances, including the inference that the defendant's destruction of the decisionmaking document was intentional because the information was adverse to defendant's position.

Given that the evidence of spoliation in this case might be interpreted by the jury as circumstantial evidence of IBM's desire to cover up discriminatory reasons for discharging Mr. Scott, the Court will permit the use of spoliation evidence as support for plaintiff's pretext theory. The negative inference permitted by evidence that IBM destroyed relevant documents provides grounds for disbelieving IBM's proffered reasons for discharging Mr. Scott under prong one of *Fuentes*, and thus his Title VII and ADEA claims survive summary judgment. The Court emphasizes that plaintiff still bears the burden of proof should this case proceed to trial. At this stage, it only finds that a jury *could* find pretext on account of this negative inference. IBM's proffered reasons for dis-

charging plaintiff are entirely plausible, and may carry the day.

Plaintiff's application for sanctions arising from destruction of defendant's documents will be denied without prejudice to the possibility that a spoliation inference will be given to the jury. The availability of that instruction will depend upon the proofs adduced at trial. Since the content of a jury instruction is normally formulated after the conclusion of evidence, or at least during trial, *see* Fed. R. Civ. P. 51, it would be premature, in the absence of a judicial determination of defendant's misconduct at this pretrial stage, to conclude that the spoliation instruction will actually be given.

### ii. *Prong Two*

Plaintiff has also proffered evidence providing evidence of pretext under the second *Fuentes* prong, but only as to his ADEA claim. Under this prong of the *Fuentes* test, a plaintiff satisfies his burden of showing pretext if he adduces additional evidence beyond the prima facie case from which a factfinder could conclude that discrimination was more likely than not a determinative factor in his discharge.

In an effort to show that age more likely than not motivated IBM's determinations of who to include in the RIF, plaintiff offers to have expert witness Dr. Peter Ingerman, Ph.D., testify that a statistical analysis of the ages of those chosen for inclusion in the RIF shows that the action taken against them is related to their ages. (Ingerman Rept. at 2, Def. Ex. 33.)

■■■ IBM argues that statistics cannot prove disparate treatment in an employment discrimination suit, and that Dr. Ingerman's

report is worthless and should not be considered. This challenge of plaintiff's proffered statistical evidence in this case presents an issue of admissibility. As the Third Circuit *en banc* stated in *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061 (3d Cir.1996), in order to rebut an employer's proffered legitimate reasons for dismissal, all the plaintiff need do is "point to some evidence, direct or circumstantial" from which a jury could find pretext. *Id.* at 1066. Therefore, at the pretext stage of the employment discrimination burden shifting paradigm, the full range of circumstantial evidence is available to the plaintiff, including but not limited to "statistical evidence showing disparate treatment by the employer of members of the protected class". *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir.1991) (citations omitted). This means that statistical evidence is not limited to disparate impact cases, and a plaintiff may present statistical findings as circumstantial evidence of intentional disparate treatment. *See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999). Thus, a plaintiff may attempt to show pretext via statistical evidence.

■■■ IBM also attacks plaintiff's statistical proffer by asserting that plaintiff's expert is incompetent, and that its own expert's statistical report, which shows no likelihood of age discrimination, is superior to Dr. Ingerman's report. The Court may not at this stage weigh competing evidence, nor decide which evidence is more probative. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir.1995).

Although IBM has raised legitimate issues concerning the value of plaintiff's statistical proffer,[10] for purposes of this summary judg-

---

**10.** The plaintiff has the burden of establishing that Dr. Ingerman's statistical opinions are admissible at trial, because only admissible evidence can be considered in assessing, under *Fuentes*, whether plaintiff has adduced evidence of discrimination beyond his prima facie case. It is doubtful that Dr. Ingerman's proffered testimony will satisfy Rules 702 and 703 of the Federal Rules of Evidence.

Under Rule 702's familiar formulation, a witness may qualify as an expert by knowledge, skill, experience, training or education. Plaintiff asserts that Dr. Ingerman's educational background includes one course in probability theory while earning a master's degree in electrical engineering, and he has been certified as a Certified Life Underwriter for selling insurance and has completed several of the mathematical phas-

es of the actuarial examinations. The deficiencies in his qualifications are manifest; he does not employ these methods in his work, he does not teach in this field, he has acquired only limited specialized knowledge of statistical analysis, and he "earned" a Ph.D. from a correspondence institution in Hilo, Hawaii. The Court recognizes that statistical expertise may be found in many fields and is not confined to those with degrees in statistics. The methods of statistical tests are well-settled in literature, and one need not know the theory behind a particular test to apply it appropriately. But Dr. Ingerman's background in this field may be too shallow.

Further, under Rule 703, the methodology employed by Dr. Ingerman in this case is questionable. The statistical test he employs must be found to fit the circumstances of this case or it

ment motion addressing plaintiff's ADEA claim, the Court need not determine the issue now. Because, as discussed above, plaintiff has proffered admissible evidence (that is, the spoliation inference) to satisfy the first *Fuentes* prong, the plaintiff need not satisfy the second *Fuentes* prong (such as by proof of statistical disparity) to sustain his ADEA claim. In summary, it suffices to say that plaintiff has created a triable issue of pretext under the first Fuentes prong for his Title VII and ADEA claims, and the Court will deny summary judgment as to those claims.

### 3. Retaliation Claims

Plaintiff also claims that IBM retaliated against him by (1) putting him in a position to fail and later firing him in retaliation for his filing of an internal Open–Door complaint in 1995, and (2) taking away his PROFs internal communication privileges after IBM management learned in March 1996 that he had filed an EEOC claim in connection with his firing.

■ Under Third Circuit precedent, to advance a prima facie case of retaliation, a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000) (citing *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir.1997); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989)).

■ The Court first considers whether plaintiff has created a triable issue as to whether IBM retaliated against him for filing an Open Door complaint concerning a poor rating by his supervisor, Mr. Johannessen. As detailed above, Mr. Scott first complained about his rating in February 1995. Scott's complaint that he had been denied a promotional opportunity was allegedly greeted with warnings and hostility. Scott testified that IBM manager Rick Weiss told Scott that this racial allegation was an "inflammatory remark" and advised Scott "I will call your branch office and have the appropriate action taken against you." When Scott persisted, Weiss allegedly gave him the "friendly advice" to "think of your career before you do or say anything else." (Scott Dep. I at 151:19–152:12.) Scott's complaint was investigated by IBM, and found no racial bias. Nonetheless, Scott claims that his firing in January 1996 was attributable at least in part to IBM management's desire to get back at him for instigating the Open Door complaint and tarnishing Johannessen's reputation with allegations of racism.

The first two elements are satisfied. Plaintiff engaged in a protected activity (filing the Open door complaint), and plaintiff was fired less than a year later. The third

will be questionable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir.1997) (holding that expert's "failure to correct for any potential explanatory variables other than age" made analyst's finding that "there was a significant correlation between age and retention" in employment inadmissible); *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537–39 (7th Cir.1997) ("a statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible"). Here, Dr. Ingerman does not know anything about the people in his statistical study other than the ages of the five persons in the terminated group of employees and the 67 persons in the retained group.

Defendant's expert, Dr. Bernard Siskin, has amply demonstrated the methodological shortcomings of employing so simplistic a test involving such a relatively small sample size, especially in the employment context. Dr. Ingerman's methodology is further weakened by his arbitrary, post-hoc selection of age 48 as the "relevant age break" between younger employees who were retained and older ones who were not. This age was selected by Dr. Ingerman's trial and error progression of possible "age breaks" between 31 and 64, selecting 48 only because that yielded the clearest discrepancy between the younger and older groups, while acknowledging that his analysis yields no statistical significance if the ADEA's age break of 40 is used. (Ingerman Dep. 51–58.)

Plaintiff must satisfy these concerns at a *Daubert* hearing to be conducted before this expert's statistical analysis and opinion testimony can be admitted at trial. This Court will not rule out the possibility of Dr. Ingerman testifying about some aspect of his analysis before the plaintiff has a greater opportunity to address these concerns.

prong of the test requires that plaintiff show a causal link between the protected activity and the firing. At this stage, all plaintiff must do is adduce sufficient evidence that a reasonable factfinder *could* find that such a link exists.

 When attempting to create prove a causal link between a protected activity and his termination, a "plaintiff may rely on a broad array of evidence to do so." *Farrell,* 206 F.3d at 283. A plaintiff may substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference. *Id.* Here, Weiss made statements that could be interpreted as threatening plaintiff with reprisals if he followed through on his Open Door complaint. This evidence provides strong circumstantial evidence of causation, inasmuch as a jury could infer that IBM's decision to terminate Scott was a follow through on these threats, or that Scott was fired at least in part because of IBM's continued irritation with him for instigating the Open Door complaint. Furthermore, as discussed above, IBM's destruction of all documentation surrounding the actual RIF decision-making process could permit the jury to make a "spoliation inference", an inference that the destroyed evidence would have cast doubt upon and/or discredited IBM's proffered reasons for discharge, and that the real reason behind the discharge was retaliation. Because plaintiff has thus come forward with evidence sufficient to grant an inference of causation, he has satisfied his burden of establishing a prima facie case of retaliation.

Plaintiff also may be able to establish retaliation based on his theory that IBM's decision to remove him from PROFs constitutes retaliation, the main issue being whether removing plaintiff from the PROFs system might be found to be an "adverse employment action". Mr. Warren has testified that it is normal for IBM employees to learn about job openings through the PROFs system. More specifically, Warren agreed that, other than the PROFs system, there is no other easy way for IBM employees to learn about job openings at IBM. (Warren Dep. I at 160:1–6.) A jury could certainly find that taking away Mr. Scott's ability to apply for other employment at IBM constitutes an adverse action, especially in light of the fact that IBM knew that Scott would be actively seeking other work after learning of his termination. *See Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 157 (3d Cir.1999) ("Post-employment actions by an employer can constitute discrimination under Title VII if they hurt a plaintiff's employment prospects.") Plaintiff's burden at trial will be to show that he was actually, not theoretically damaged by IBM's decision to remove him from PROFs.

IBM denies that it retaliated against plaintiff, and maintains that his dismissal was based on poor performance and the need to shed workers. Nevertheless, for reasons already discussed the Court finds that plaintiff has adduced sufficient evidence of pretext that this claim must be presented to a jury. Accordingly, the Court finds that plaintiff has created a genuine issue of material fact as to whether his discharge was based on retaliatory animus.

### 4. *Plaintiff's § 1981 and NJLAD claims*

Plaintiff admittedly filed suit more than two years after he was surplused, and concedes that this normally would bar his claims under 42 U.S.C. § 1981 and the New Jersey Law Against Discrimination, both of which are subject to a two-year statute of limitations. *See Montells v. Haynes,* 133 N.J. 282, 627 A.2d 654 (1993) (NJLAD subject to two-year tort limitation); *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660–62, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (two-year period for § 1983 claims). Nevertheless, plaintiff contends that his § 1981 and NJLAD claims should survive the present motion.

Plaintiff argues that IBM misrepresented the reason his PROFs access was terminated, and intentionally concealed the ASPP manager's documentation until after he commenced this litigation, and that this concealment protects his § 1981 and NJLAD claims from the limitations period under the discovery rule, the doctrine of equitable estoppel, the doctrine of equitable tolling, or some combination thereof. (Pl. Br. at 26–29.) These arguments are without merit.

In employment discrimination cases, the cause of action accrues and the statute begins to run when the adverse decision is made and is communicated to the plaintiff. *Oshiver v. Levin, Fishbein, Sedran, & Berman,* 38 F.3d 1380, 1385–86 (3d Cir.1994). Plaintiff's claim is not that he did not know about the adverse decisions affecting his employment at IBM, but rather that IBM somehow concealed from him the real reason for the adverse decisions. Evidence that an employer has actively misled the plaintiff may be a basis for tolling the limitations period under the equitable tolling or equitable estoppel doctrines; however, the burden is on the plaintiff to show that the defendant actively misled him, and that this deception *caused* the plaintiff's non-compliance with the limitations period. *See Oshiver,* 38 F.3d at 1387–90.

Here, Mr. Scott has not offered any evidence that IBM's alleged actions in this case caused his non-compliance with the limitations period. Plaintiff's EEOC charge, filed in March 1996, asserts claims of discrimination and retaliation based on his termination and alleged denial of access to internal job opportunities. (Def.Ex. 29.) He makes the same assertions, in more detail, in his complaint in this case. His NJLAD and § 1981 claims in the present complaint were based on the same allegations as the claims he had asserted in his EEOC charge under other statutes, and thus Mr. Scott has not alleged that he learned anything new between the time he filed his EEOC charge in March 1996 and the filing of his complaint in state court in this case more than two years later on July 20, 1998. Because plaintiff stated in his initial EEOC filing the same claims he later brought in his civil lawsuit, it is evident that he simply slept on his rights. There is nothing in the record to suggest that IBM attempted to throw plaintiff off the track of a cause of action. To the contrary, the fact that he filed with the EEOC indicates that he was well aware of the accrual of his cause of action in 1996 but did not timely act to commence suit. Thus, there is no basis for tolling the statute of limitations for filing claims under the NJLAD and § 1981 due to any inequitable or misleading conduct by IBM. Accordingly, plaintiff's NJLAD and § 1981 claims are untimely as a matter of law and will be dismissed.

## CONCLUSION

For the reasons discussed herein, the defendant's motion for summary judgment will be granted in part and denied in part, and plaintiff's cross motion for partial summary judgment will be denied in its entirety. Plaintiff's motion in limine to exclude use of or reference to the "Boutot notebook" is also denied. The accompanying order is entered.

## *ORDER*

THIS MATTER having come before the Court on the parties' cross-motions for summary judgment pursuant to Rule 56, Fed. R.Civ.P., and the Court having considered the parties' submissions, and for the reasons discussed in today's Opinion; IT IS this 27th day of September, 2000 **ORDERED AS FOLLOWS:**

1. Defendant's motion is **GRANTED** to the extent that it seeks summary judgment against plaintiff's claims under the ADA, the New Jersey Law Against Discrimination (NJLAD), 42 U.S.C. § 1981, and plaintiff's common law fraud claim, and plaintiff's claims under the ADA, the NJLAD, 42 U.S.C. § 1981, and common law fraud are hereby **DISMISSED WITH PREJUDICE.**

2. Defendant's motion for summary judgment is otherwise **DENIED;** and

3. Plaintiff's motion for partial summary judgment on the issue of ADA liability is **DENIED;** and

4. Plaintiff's motion in limine to exclude use of or reference to the "Boutot notebook" is **DENIED;** and

5. The remainder of plaintiff's complaint shall proceed to trial in the ordinary course; and

6. Plaintiff's application for sanctions arising from defendant's alleged spolia-

tion of evidence is **DENIED** without prejudice to the possibility that the Court may determine at trial that the evidence of spoliation warrants giving the jury a spoliation instruction or no such instruction or imposition of a greater sanction.